# UNITED STATES *v.* REPUBLIC STEEL CORP. ET AL.

No. 56.   Argued January 12–13, 1960.—
Decided May 16, 1960.

*Solicitor General Rankin* argued the cause for the United States.  With him on the brief were *Assistant Attorney General Morton* and *Roger P. Marquis.*

*Raymond T. Jackson* argued the cause for Interlake Iron Corporation, respondent. With him on the brief were *Warren Daane* and *Henry E. Seyfarth.*

*Paul R. Conaghan* argued the cause and filed a brief for Republic Steel Corporation, respondent.

*Peter A. Dammann* and *W. S. Bodman* filed a brief for International Harvester Company, respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a suit by the United States to enjoin respondent companies from depositing industrial solids in the Calumet River (which flows out of Lake Michigan and connects eventually with the Mississippi) without first obtaining a permit from the Chief of Engineers of the Army providing conditions for the removal of the deposits and to order and direct them to restore the depth of the channel to 21 feet by removing portions of existing deposits.

The District Court found that the Calumet was used by vessels requiring a 21-foot draft, and that that depth has been maintained by the Corps of Engineers. Respondents, who operate mills on the banks of the river for the production of iron and related products, use large quantities of the water from the river, returning it through numerous sewers. The processes they use create industrial waste containing various solids. A substantial quantity of these solids is recovered in settling basins but, according to the findings, many fine particles are discharged into the river and they flocculate into larger units and are deposited in the river. bottom. Soundings show a progressive decrease in the depth of the river in the vicinity of respondents' mills. But respondents have refused, since 1951, the demand of the Corps of Engineers

that they dredge that portion of the river. The shoaling conditions being created in the vicinity of these plants were found by the District Court to be created by the waste discharged from the mills of respondents.[1] This shoaling was found to have reduced the depth of the channel to 17 feet in some places and to 12 feet in others. The District Court made findings which credited respondents with 81.5% of the waste deposited in the channel, and it allocated that in various proportions among the three respondents. See 155 F. Supp. 442.

The Court of Appeals did not review the sufficiency of evidence. It dealt only with questions of law and directed that the complaint be dismissed. 264 F. 2d 289. The case is here on a petition for a writ of certiorari which we granted because of the public importance of the questions tendered. 359 U. S. 1010.

Section 10 of the Rivers and Harbors Act of 1899, 30 Stat. 1121, 1151, as amended, 33 U. S. C. § 403, provides in part: [2]

> "That the creation of *any obstruction* not affirmatively authorized by Congress, *to the navigable capacity* of any of the waters of the United States is hereby prohibited; . . ." (Italics added.)

---

[1] A House Report contains similar animadversions. H. R. Rep. No. 1345, 83d Cong., 2d Sess., p. 10.

[2] Section 10 provides in full:

"That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any

The section goes on to outlaw various structures "in" any navigable waters except those initiated by plans recommended by the Chief of Engineers and authorized by the Secretary of the Army. Section 10 then states that "it shall not be lawful to excavate or fill, or in any manner to alter or modify the . . . capacity of . . . the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

A criminal penalty is added by § 12; and § 12 further provides that the United States may sue to have "any structures or parts of structures erected" in violation of the Act removed. Section 17 directs the Department of Justice to "conduct the legal proceedings necessary to enforce" the provisions of the Act, including § 10.

Section 13 forbids the discharge of "any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States"; but § 13 grants authority to the Secretary of the Army to permit such deposits under conditions prescribed by him.

Our conclusions are that the industrial deposits placed by respondents in the Calumet have, on the findings of the District Court, created an "obstruction" within the meaning of § 10 of the Act and are discharges not exempt under § 13. We also conclude that the District Court was authorized to grant the relief.

The history of federal control over obstructions to the navigable capacity of our rivers and harbors goes back

port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

to *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1, 8, where the Court held "there is no common law of the United States" which prohibits "obstructions" in our navigable rivers. Congress acted promptly, forbidding by § 10 of the Rivers and Harbors Act of 1890, 26 Stat. 426, 454, "the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity" of any waters of the United States. The 1899 Act followed a report [3] to Congress by the Secretary of War, which at the direction of Congress, 29 Stat. 234, contained a compilation and revision of existing laws relating to navigable waters. The 1899 Act was said to contain "no essential changes in the existing law." [4] Certainly so far as outlawry of any "obstructions" in navigable rivers is concerned there was no change relevant to our present problem.

It is argued that "obstruction" means some kind of structure. The design of § 10 should be enough to refute that argument, since the ban of "any obstruction," unless approved by Congress, appears in the first part of § 10, followed by a semicolon and another provision which bans various kinds of structures unless authorized by the Secretary of the Army.

The reach of § 10 seems plain. Certain types of structures, enumerated in the second clause, may not be erected "in" any navigable river without approval by the Secretary of the Army. Nor may excavations or fills, described in the third clause, that alter or modify "the course, location, condition, or capacity of" a navigable river be made unless "the work" has been approved by the Secretary of the Army. There is, apart from these par-

---

[3] H. R. Doc. No. 293, 54th Cong., 2d Sess.

[4] 32 Cong. Rec., Pt. 3, p. 2923, which reports the statement by the House Conferees. For the discussion in the Senate see 32 Cong. Rec. 2296–2298.

ticularized invasions of navigable rivers, which the Secretary of the Army may approve, the generalized first clause which prohibits "the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity" of such rivers. We can only conclude that Congress planned to ban any type of "obstruction," not merely those specifically made subject to approval by the Secretary of the Army. It seems, moreover, that the first clause being specifically aimed at "navigable capacity" serves an end that may at times be broader than those served by the other clauses. Some structures mentioned in the second clause may only deter movements in commerce, falling short of adversely affecting navigable capacity. And navigable capacity of a waterway may conceivably be affected by means other than the excavations and fills mentioned in the third clause. We would need to strain hard to conclude that the only obstructions banned by § 10 are those enumerated in the second and third clauses. In short, the first clause is aimed at protecting "navigable capacity," though it is adversely affected in ways other than those specified in the other clauses.

There is an argument that § 10 of the 1890 Act, 26 Stat. 454, which was the predecessor of the section with which we are now concerned, used the words "any obstruction" in the narrow sense, embracing only the prior enumeration of obstructions in the preceding sections of the Act. The argument is a labored one which we do not stop to refute step by step. It is unnecessary to do so, for the Court in *United States* v. *Rio Grande Irrigation Co.*, 174 U. S. 690, 708, decided not long after the 1890 Act became effective, gave the concept of "obstruction," as used in § 10, a broad sweep: "It is not a prohibition of any obstruction to the navigation, but any obstruction to the navigable capacity, and anything, wherever done

or however done, within the limits of the jurisdiction of the United States which tends to destroy the navigable capacity of one of the navigable waters of the United States, is within the terms of the prohibition." This broad construction given § 10 of the 1890 Act was carried over to § 10 of the 1899 Act in *Sanitary District* v. *United States*, 266 U. S. 405, 429, the Court citing *United States* v. *Rio Grande Irrigation Co.*, *supra*, with approval and saying that § 10 of the 1899 Act was "a broad expression of policy in unmistakable terms, advancing upon" § 10 of the 1890 Act.

The decision in *Sanitary District* v. *United States*, *supra*, seems to us to be decisive. There the Court affirmed a decree enjoining the diversion of water from Lake Michigan through this same river. Mr. Justice Holmes, writing for the Court, did not read § 10 narrowly but in the spirit in which Congress moved to fill the gap created by *Willamette Iron Bridge Co.* v. *Hatch*, *supra*. That which affects the water level may, he said, amount to an "obstruction" within the meaning of § 10:

> "Evidence is sufficient, if evidence is necessary, to show that a withdrawal of water on the scale directed by the statute of Illinois threatens and will affect the level of the Lakes, and that is a matter which cannot be done without the consent of the United States, even were there no international covenant in the case." *Sanitary District* v. *United States*, *supra*, 426.

> . . . . .

> "There is neither reason nor opportunity for a construction that would not cover the present case. As now applied it concerns a change in the condition of the Lakes and the Chicago River, admitted to be navigable, and, if that be necessary, an obstruction to their navigable capacity . . . ." *Id.*, at 429.

It is said that that case is distinguishable because it involved the erections of "structures," prohibited by the second clause of § 10. The "structures" erected, however, were not "in" navigable waters. The Sanitary District had reversed the flow of the Chicago River, "formerly a little stream flowing into Lake Michigan," 266 U. S., at 424, and used it as a sluiceway to draw down the waters of the Great Lakes to a dangerous degree. Moreover, the Court did not rely on the second clause of § 10 but on the first and the third. *Id.,* at 428. The decree in that case did not run against any "structure"; it merely enjoined the diversion of water from Lake Michigan in excess of 250,000 cubic feet per minute.

That broad construction of § 10 was reaffirmed in *Wisconsin* v. *Illinois,* 278 U. S. 367, 414, another case involving the reduction of the water level of the Great Lakes by means of withdrawals through the Chicago River. And the Court, speaking through Chief Justice Taft (*id.,* at 406, 414, 417), made clear that it adhered to what Mr. Justice Holmes had earlier said, "This withdrawal is prohibited by Congress, except so far as it may be authorized by the Secretary of War." *Sanitary District* v. *United States, supra,* at 429.

The teaching of those cases is that the term "obstruction" as used in § 10 is broad enough to include diminution of the navigable capacity of a waterway by means not included in the second or third clauses. In the *Sanitary District* case it was caused by lowering the water level. Here it is caused by clogging the channel with deposits of inorganic solids. Each affected the navigable "capacity" of the river. The concept of "obstruction" which was broad enough to include the former seems to us plainly adequate to include the latter.

As noted, § 13 bans the discharge in any navigable water of "any refuse matter of any kind or description what-

ever other than that flowing from streets and sewers and passing therefrom in a liquid state." The materials carried here are "industrial solids," as the District Court found. The particles creating the present obstruction were in suspension, not in solution. Articles in suspension, such as organic matter in sewage, may undergo chemical change. Others settle out. All matter in suspension is not saved by the exception clause in § 13. Refuse flowing from "sewers" in a "liquid state" means to us "sewage." Any doubts are resolved by a consistent administrative construction which refused to give immunity to industrial wastes resulting in the deposit of solids in the very river in question.[5] The fact that

---

[5] We have a rather precise history of administrative construction of the 1899 Act as it applies to the deposit of solids in the Calumet River by mills located on it. The Army Engineers, beginning in 1909, warned a steel company of the accumulation of solids from industrial wastes being poured into the Calumet. In 1918, 1920, 1924, 1927, 1928, 1931, and 1937 the District Engineer required these deposits to be removed. An improvement in the Calumet was authorized by the Act of August 30, 1935, 49 Stat. 1028, 1036, on the basis of a report from the Army Engineers. See H. R. Doc. No. 494, 72d Cong., 2d Sess. The costs were computed on the basis that shoals created by the deposit of solids would be removed by the company creating them. The report states, at p. 24, "It is assumed, in this estimate, that the shoal adjacent to the outer bulkhead of the Illinois Steel Co. will be removed by that company to the depth of 21 feet originally provided by the United States."

This long-standing administrative construction, while not conclusive of course, is entitled to "great weight" even though it arose out of cases "settled by consent rather than in litigation." *Federal Trade Comm'n* v. *Mandel Brothers, Inc.*, 359 U. S. 385, 391.

For references in public documents to this administrative construction see H. R. Doc. No. 237, 63d Cong., 1st Sess., pp. 77, 160; S. Rep. No. 66, 68th Cong., 1st Sess., p. 2; H. R. Doc. No. 494, 72d Cong., 2d Sess., pp. 24, 34; S. Rep. No. 2225, 74th Cong., 2d Sess., p. 2; Hearings, Civil Functions, Department of the Army Appropriations for 1955, Subcommittee of House Committee on

discharges from streets and sewers may contain some articles in suspension that settle out and potentially impair navigability [6] is no reason for us to enlarge the group to include these industrial discharges. We follow the line Congress has drawn and cannot accept the invitation to broaden the exception in § 13 because other matters "in a liquid state" might logically have been treated as favorably as sewage is treated. We read the 1899 Act charitably in light of the purpose to be served. The philosophy of the statement of Mr. Justice Holmes in *New Jersey* v. *New York,* 283 U. S. 336, 342, that "A river is more than an amenity, it is a treasure," forbids a narrow, cramped reading either of § 13 or of § 10.

The Court of Appeals concluded that even if violations were shown, no relief by injunction is permitted. Yet § 17 provides, as we have seen, that "the Department of Justice shall conduct the legal proceedings necessary to enforce" the provisions of the Act, including § 10. It is true that § 12 in specifically providing for relief by injunction refers only to the removal of "structures" erected in violation of the Act (see *United States* v. *Bigan,* 274 F. 2d 729), while § 10 of the 1890 Act provided for the enjoining of any "obstruction." Here again *Sanitary*

Appropriations, 83d Cong., 2d Sess., Pt. 1, pp. 695–696; H. R. Rep. No. 1345, 83d Cong., 2d Sess., p. 10.

[6] H. R. Doc. No. 417, 69th Cong., 1st Sess., p. 9, states:

"In some instances the organic solid matter in sewage and wastes causes temporary shoaling in the vicinity of the point of discharge, but in most cases of this kind nature eventually decomposes this organic matter and rectifies the condition. In a few instances, where large quantities of sewage are discharged into sluggish and restricted waters, overpollution results and the oxygen content remains insufficient to enable nature to break up the solids. In such cases permanent shoaling in the vicinity of the point of discharge results and dredging must be resorted to. As a rule such dredging is well attended to by municipal authorities."

*District* v. *United States, supra,* is answer enough. It was argued in that case that relief by injunction was restricted to removal of "structures." See 266 U. S., at 408. But the Court replied, "The Attorney General by virtue of his office may bring this proceeding and no statute is necessary to authorize the suit." [7] *Id.,* at 426. The authority cited was *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273, where a suit was brought by the Attorney General to set aside a fraudulent patent to public lands. The Court held that the Attorney General could bring suit, even though Congress had not given specific authority. The test was whether the United States had an interest to protect or defend. Section 10 of the present Act defines the interest of the United States which the injunction serves. Protection of the water level of the Great Lakes through injunctive relief, *Sanitary District* v. *United States, supra,* is precedent enough for ordering that the navigable capacity of the Calumet River be restored. The void which was left by *Willamette Iron Bridge Co.* v. *Hatch, supra,* need not be filled by detailed codes which provide for every contingency. Congress has legislated and made its purpose clear; it has provided enough federal law in § 10 from which appropriate remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation. This is for us the meaning of *Sanitary District* v. *United States, supra,* on this procedural point.[8]

---

[7] The "main ground" advanced was the interest of the United States in removing obstructions to commerce. 266 U. S., at 426. Another ground was a treaty with Great Britain. *Id.,* at 425–426. But these were alternative grounds, the treaty rights being treated as lesser or subordinate interests. *Id.,* at 426.

[8] See Comment, Substantive and Remedial Problems in Preventing Interferences with Navigation: The Republic Steel Case, 59 Col. L. Rev. 1065, 1079.

Since the Court of Appeals dealt only with these questions of law and not with subsidiary questions raised by the appeal, we remand the case to it for proceedings in conformity with this opinion.

*Reversed.*

Memorandum of MR. JUSTICE FRANKFURTER, dissenting.

In the absence of comprehensive legislation by Congress dealing with the matter, I would go a long way to sustain the power of the United States, as *parens patriae,* to enjoin a nuisance that seriously obstructs navigation. But that road to judicial relief in this case is, in light of *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1, barred by the Rivers and Harbors Act of 1899. For the reasons set forth by my Brother HARLAN, the structure and history of that Act, reflected by the very particularities of its provisions, make it unavailable for the situation now before the Court.

MR. JUSTICE HARLAN, with whom MR. JUSTICE FRANKFURTER, MR. JUSTICE WHITTAKER and MR. JUSTICE STEWART join, dissenting.

In my opinion this decision cannot be reconciled with the terms of the Rivers and Harbors Act of 1899, apart from which the Court, as I understand its opinion, does not suggest the United States may prevail in this case. Far from presenting the clear and simple statutory scheme depicted by the Court, the provisions of the governing statute are complex and their legislative history tortuous. My disagreement with the Court rests on four grounds: (1) that the term "any obstruction" in § 10 of the Act was not used at large, so to speak, but refers only to the particular kinds of obstructions specifically enumerated in the Act; (2) that the discharge of this liquid matter from

the respondents' mills does not fall within any of the Act's specific proscriptions; (3) that in any event injunctive relief was not authorized; and (4) that *Sanitary District* v. *United States,* 266 U. S. 405, does not militate against any of these conclusions.

Five sections of the Act are relevant to this case:

(1) Section 9, 33 U. S. C. § 401, makes it unlawful to construct any bridge, dam, dike, or causeway without the consent of Congress and the approval of the Chief of Engineers and the Secretary of War.[1]

(2) Section 10, 33 U. S. C. § 403, contains three clauses: *Clause 1* provides "That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited." *Clause 2* makes it unlawful to build any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structure

---

[1] Section 9 provides in full as follows:

"That it shall not be lawful to construct or commence the construction of any bridge, dam, dike, or causeway over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for the same shall have been submitted to and approved by the Chief of Engineers and by the Secretary of War: *Provided,* That such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Chief of Engineers and by the Secretary of War before construction is commenced: *And provided further,* That when plans for any bridge or other structure have been approved by the Chief of Engineers and by the Secretary of War, it shall not be lawful to deviate from such plans either before or after completion of the structure unless the modification of said plans has previously been submitted to and received the approval of the Chief of Engineers and of the Secretary of War."

without complying with certain conditions. *Clause 3* makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of . . . the channel of any navigable water" without the authorization of the Secretary of War.[2]

(3) Section 12, 33 U. S. C. § 406, provides that violation of § 9, § 10, or § 11 (the last[3] not being material here) constitutes a misdemeanor, and that removal of any "structures or parts of structures" erected in violation of said sections may be enforced by injunction.[4]

---

[2] Section 10 provides in full as follows:

"That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of War; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same."

[3] Section 11 deals with the power of the Secretary of War to establish harbor lines.

[4] Section 12 provides in full as follows:

"That every person and every corporation that shall violate any of the provisions of sections nine, ten, and eleven of this Act, or any rule or regulation made by the Secretary of War in pursuance of the provisions of the said section fourteen, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding twenty-five hundred dollars nor less than five

496

(4) Section 13, 33 U. S. C. § 407, makes it unlawful to place in navigable waters any refuse of any kind other than "that flowing from streets and sewers and passing therefrom in a liquid state . . . ." [5]

hundred dollars, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any circuit court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney-General of the United States."

[5] Section 13 provides in full as follows:

"That it shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom in a liquid state, into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, either by ordinary or high tides, or by storms or floods, or otherwise, whereby navigation shall or may be impeded or obstructed: *Provided,* That nothing herein contained shall extend to, apply to, or prohibit the operations in connection with the improvement of navigable waters or construction of public works, considered necessary and proper by the United States officers supervising such improvement or public work: *And provided further,* That the Secretary of War, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful."

(5) Section 16, 33 U. S. C. § 411, makes violation of § 13, § 14, or § 15 (the latter two not being involved here)[6] a misdemeanor. No injunctive relief is provided for.[7]

---

[6] Section 14 deals with unauthorized use and occupation of federal navigational installations. Section 15 deals with floating obstructions and sunken vessels.

[7] Section 16 provides in full as follows:

"That every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections thirteen, fourteen, and fifteen of this Act shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding twenty-five hundred dollars nor less than five hundred dollars, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person or persons giving information which shall lead to conviction. And any and every master, pilot, and engineer, or person or persons acting in such capacity, respectively, on board of any boat or vessel who shall knowingly engage in towing any scow, boat, or vessel loaded with any material specified in section thirteen of this Act to any point or place of deposit or discharge in any harbor or navigable water, elsewhere than within the limits defined and permitted by the Secretary of War, or who shall willfully injure or destroy any work of the United States contemplated in section fourteen of this Act, or who shall willfully obstruct the channel of any waterway in the manner contemplated in section fifteen of this Act, shall be deemed guilty of a violation of this Act, and shall upon conviction be punished as hereinbefore provided in this section, and shall also have his license revoked or suspended for a term to be fixed by the judge before whom tried and convicted. And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections thirteen, fourteen, and fifteen of this Act shall be liable for the pecuniary penalties specified in this section, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft, which latter sum shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof."

The Court holds that respondents have violated §§ 10 and 13, and that injunctive relief is authorized under the present circumstances. A closer examination of the Act and its history than that undertaken in the Court's opinion, in my view, refutes both conclusions.

I.

The Court relies primarily on the first clause of § 10, which provides:

> "That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited . . . ."

If that clause stood in isolation, it might bear the broad meaning which the Court now attributes to it. However, it is but one part of an involved and comprehensive statute which has emerged from a long legislative course. The bare words of the clause cannot be considered apart from that context.

Two circumstances apparent on the face of the statute immediately raise a doubt whether the term "any obstruction" can be taken in its fullest literal sense. *First,* the clause is surrounded in the statute by an exhaustive enumeration of particular types of obstructions and cognate activities, that is, "bridge, dam, dike, or causeway" (§ 9); "wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures" (§ 10, cl. 2); "excavate," "fill," "alter," "modify" (§ 10, cl. 3); and "any refuse matter of any kind" (§ 13). If the "any obstruction" clause were intended to cover a category of obstructions not included within any of the specific enumerations, it is strange that it should be inserted at the beginning of a section which lists several specific obstructions and which is itself both preceded and followed by other sections making similar enumerations. *Second,* the lawful creation of

the structural obstructions mentioned in § 9 requires the approval of Congress, while those listed in clauses 2 and 3 of § 10 and in § 13 can be lawfully accomplished with only the authorization of the Secretary of War. Yet clause 1 of § 10 says that *"any* obstruction" must be affirmatively authorized by Congress. If the clause is taken in its literal sense, the condition of congressional approval therein prescribed is difficult to square with the condition of approval by the Secretary of War prescribed as to many of the obstructions specifically enumerated.[8] Because of the doubts raised by these considerations, it becomes necessary to explore the derivation of the 1899 Act. When this is done, I believe it will be found that "any obstruction" will not bear the broad meaning given it by the Court, but that it must be taken as embracing only the particular obstructions specified in the statute.

The provisions of the 1899 Act dealing with obstructions derive ultimately from a proposal made by the Chief of Engineers and transmitted to Congress by the Secretary of War in 1877.[9] A bill based on this recommendation was three times introduced in Congress,[10] and came to be known as the Dolph bill. It was reported favorably all three times, and was passed by the Senate twice.[11] It enumerated the proscribed obstructions in terms virtually

---

[8] It is to be noted that if § 10, cl. 1, is construed to cover obstructions not within any of the Act's specific prohibitions, and if the respondents' practices are held to fall only within § 10, cl. 1, then the relief granted by the District Court would not in any event be proper, since its decree required only the approval of the Chief of Engineers of the Department of the Army. 155 F. Supp. 442, 453.

[9] The letters are reprinted in S. Rep. No. 224, 50th Cong., 1st Sess.

[10] H. R. 2007, 49th Cong., 1st Sess.; S. 27, 50th Cong., 1st Sess.; S. Rep. No. 224, 50th Cong., 1st Sess.; H. R. Rep. No. 2760, 50th Cong., 1st Sess.; S. 88 and H. R. 394, 51st Cong., 1st Sess.; H. R. Rep. No. 1635, 51st Cong., 1st Sess.; H. R. Rep. No. 477, 51st Cong., 1st Sess.

[11] 19 Cong. Rec. 2338, 21 Cong. Rec. 1319.

500

identical to those contained in the 1899 Act, *but did not contain the "any obstruction" clause found in § 10 of that Act.*

After the Senate had for the second time passed the Dolph bill but before the House had acted on it, the annual rivers and harbors appropriation bill, which was to become the Rivers and Harbors Act of 1890,[12] came up for consideration on the floor of Congress. The bill already contained a set of provisions dealing with the power of the Secretary of War to order the alteration or removal of bridges which obstructed navigation. During the Senate debate on those provisions, Senator Edmunds of Vermont offered as an amendment an additional section which provided as follows:

> "Every obstruction, not affirmatively authorized by law, to the navigable capacity of any waters in respect of which the United States has jurisdiction is hereby prohibited. . . . Every person and every corporation which shall be guilty of creating or continuing any such obstruction in this section mentioned shall be deemed guilty of a misdemeanor . . . . The creating or continuing of any obstruction in this section mentioned may be prevented by the injunction of any circuit court . . . ."[13]

Subsequently, the Dolph bill was offered *in toto* as a further amendment.[14] The Senate accepted the Edmunds amendment and passed the appropriation bill as so amended,[15] but it refused to add the Dolph bill.[16] In conference, however, it was decided to accept both by combining them. The penal section of the Dolph bill, which

[12] 26 Stat. 426.
[13] 21 Cong. Rec. 8607.
[14] 21 Cong. Rec. 8684.
[15] 21 Cong. Rec. 8608, 8691.
[16] 21 Cong. Rec. 8685.

followed all of the sections enumerating particular obstructions, had provided simply that every offender against any provision of the Act should forfeit a $250 penalty and be liable for actual damages. The conferees deleted that entire section and replaced it with an adaptation of the Edmunds amendment.[17] The latter, which was enacted into law as § 10 of the Rivers and Harbors Act of 1890, read as follows:

> "That the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters, in respect of which the United States has jurisdiction, is hereby prohibited. . . . Every person and every corporation which shall be guilty of creating or continuing any such unlawful obstruction in this act mentioned, or who shall violate the provisions of the last four preceding sections of this act, shall be deemed guilty of a misdemeanor . . . [T]he creating or continuing of any unlawful obstruction in this act mentioned may be prevented and such obstruction may be caused to be removed by the injunction of any circuit court . . . ." [18]

Thus, the Edmunds amendment, in which the "any obstruction" clause had first appeared, and which carried both penal and injunctive sanctions, was substituted for a section which theretofore had contained purely penal provisions and had followed an exhaustive enumeration of those particular obstructions to which the penalties applied. It is to be further noted that while the original Edmunds amendment had made its remedial provisions applicable to any person creating "any such obstruction *in this section* mentioned," Congress, in incorporating the Edmunds amendment into the Dolph bill, made such provisions applicable to any person creating "any such unlaw-

---

[17] 21 Cong. Rec. 9558.
[18] 26 Stat. 454.

ful obstruction *in this act* mentioned, or who shall violate the provisions of the last four preceding sections of this act . . . ." (Emphasis added.) In both instances, the word "such" clearly referred back to the initial sentence of the section prohibiting "any obstruction," the only place in either bill where that term appears. Whatever the meaning of "any obstruction" may have been in the original Edmunds amendment, Congress made it clear in § 10 of the 1890 Act that "such" obstruction meant those obstructions "in this act mentioned." To consider "any obstruction" in that section as embracing something more than the kinds of obstructions specifically enumerated in the Act would lead to the conclusion that the remedial provisions of § 10 did not cover all the obstructions proscribed by the first sentence of the section.[19] Definition

---

[19] The scanty legislative history in connection with the Edmunds amendment does not militate against this view. It was reported from the Senate Judiciary Committee with no explanation three days before the floor consideration of the appropriation bill. See 21 Cong. Rec. 8603. It was first discussed in the context of its effect on the problem of bridges and its relation to the provisions already in the appropriation bill dealing with the Secretary of War's power over bridges. *Id.,* 8603–8605. Subsequent discussion centered on the meaning of the term "not affirmatively authorized by law." *Id.,* 8607.

Two isolated statements which might be read to attribute a catch-all meaning to "any obstruction" are inconclusive. Senator Edmunds referred to an example which had been brought to the Judiciary Committee's attention, involving a railroad company which had been tumbling rocks into a navigable river. *Ibid.* However, it seems that even the specific "refuse" provisions of the Dolph bill would have covered such a practice, and in any event, discussion of the Edmunds amendment out of the context of the Dolph bill can hardly be significant as to the scope of the "any obstruction" clause with relation to the Dolph bill. Senator Carlisle referred to the Edmunds amendment as covering not only bridges, but "all obstructions of every kind whatsoever." *Id.,* 8689. Apart from the fact that this statement was made prior to the adaptation of the

of an additional set of offenders—those "who shall violate the provisions of the last four preceding sections of this act"—was made necessary by the fact that the Dolph bill contained prohibitions of several practices which might not amount to obstructions.

From this background, I think the reasonable conclusion to be drawn is that "any obstruction" in § 10 of the 1890 Act referred only to those obstructions enumerated in the preceding sections of the Act, and not to obstruction in the catchall sense.[20]

---

Edmunds amendment for purposes of incorporation into the Dolph bill, Senator Carlisle's own subsequent proposal to eliminate the Edmunds amendment but to incorporate its provisions for judicial proceedings into the section of the bill dealing with bridges, thereby "harmonizing" the two provisions, *ibid.*, casts grave doubt on whether the Senator himself believed that the Edmunds amendment covered any obstructions other than those created by bridges.

[20] The Court asserts that a contrary construction of § 10 of the 1890 Act was established by *United States* v. *Rio Grande Irrigation Co.*, 174 U. S. 690. The defendant there attempted to build a dam across the Rio Grande River in New Mexico. The building of dams was specifically prohibited by § 7 of the 1890 Act. The defendant, however, contended that the Act did not apply because the Rio Grande was nonnavigable at the point where the dam was to be built. The very passage of which the Court quotes only a part deals simply with that contention:

"It is urged that the true construction of this act limits its applicability to obstructions in the navigable portion of a navigable stream, and that as it appears that although the Rio Grande may be navigable for a certain distance above its mouth, it is not navigable in the Territory of New Mexico, this statute has no applicability. The language is general, and must be given full scope. It is not a prohibition of any obstruction to the navigation, but any obstruction to the navigable capacity, and anything, wherever done or however done, within the limits of the jurisdiction of the United States which tends to destroy the navigable capacity of one of the navigable waters of the United States, is within the terms of the prohibition. . . . [I]t would be to improperly ignore the scope of this language to limit it

The Rivers and Harbors Act of 1899, with which the present case is directly concerned, came about as a result of Congress' direction to the Secretary of War in 1896 to prepare a compilation and revision of existing general laws relating to navigable waters.[21] The Secretary's report purported only to codify existing law with no substantive changes,[22] and Senator Frye, the Chairman of the Commerce Committee, and the conferees on the bill as ultimately passed, confirmed that the legislation was to have no new substantive effect.[23] This indeed is recognized by the Court. As part of the codification, Congress took the first sentence of § 10 of the 1890 Act and inserted it as the first sentence of one of the provisions enumerating several specific obstructions which then became § 10 of the 1899 Act.[24] There is nothing to indicate that in so doing, Congress departed from its announced intention to leave the substance of the Act unchanged. Thus the "any obstruction" language of the first sentence of new § 10 was, as it had been in the old § 10, simply declaratory of all the obstructions specifically proscribed throughout the Act, whether of a structural or nonstructural nature.[25]

---

to the acts done within the very limits of navigation of a navigable stream." *Id.*, at 708.

The Court was obviously not remotely concerned with the issue in the present case, *i. e.*, whether the first clause of § 10 covers obstructions not enumerated in the remainder of the Act, since the dam there involved was specifically covered by § 7.

[21] 29 Stat. 234.

[22] H. R. Doc. No. 293, 54th Cong., 2d Sess.

[23] 32 Cong. Rec. 2296–2297, 2923.

[24] The identity of the numbers of the respective sections in the new and old Acts is purely coincidental.

[25] This construction of the first clause of § 10 seems to have been assumed, though not expressly passed on, by this Court in *Wisconsin* v. *Illinois*, 278 U. S. 367, 412–413. The phrase "not affirmatively authorized by law" was changed to "not affirmatively authorized by Congress" simply to overcome the holding of a lower court

## II.

I cannot agree that respondents' practices are prohibited by any of the specific provisions of the Act of which § 10, cl. 1, is declaratory. The Court seems to rely in part on § 10, cl. 3, on the theory that the discharge from respondents' plants "alter or modify the . . . capacity" of the Calumet River. But again, this provision must be read in context. It is evident that in §§ 9 and 10 Congress was dealing with obstructions which are *constructed,* in a conventional sense, reserving for § 13 the treatment of discharges of refuse which may eventually create obstructions. The structure of § 10, cl. 3, itself confirms this. The basic prohibition of the clause relates to excavations and fills, both of which represent construction in the ordinary sense of that term. The immediately following phrase, "or in any manner to alter or modify the . . . capacity . . . of the channel of any navigable water," must be read as referring to the same general class of things as the basic prohibition of the clause. If there could be any doubt about the clause's frame of reference, it is dispelled by the concluding words: "unless the *work* has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same." (Emphasis added.)

Finally, I do not believe that § 13 can be construed to proscribe respondents' practices. The term "any refuse

that authorization by state law was sufficient. *United States* v. *Bellingham Bay Boom Co.,* 72 F. 585 (C. C. D. Wash. 1896), aff'd, 81 F. 658 (C. C. A. 9th Cir. 1897), rev'd on other grounds, 176 U. S. 211 (1900). See *Sanitary District* v. *United States,* 266 U. S. 405, 429; *Wisconsin* v. *Illinois, supra,* at 412. Since the prohibition of the clause covers both those obstructions which require congressional approval and those which require only approval of the Secretary of War, the phrase "authorized by Congress" must be read to mean authorized by Congress or the agency designated by it. *Wisconsin* v. *Illinois, supra,* at 412–413.

matter of any kind or description whatever" undoubtedly embraces the matter discharged from respondents' mills. However, § 13 expressly exempts refuse "flowing from streets and sewers and passing therefrom in a liquid state." [26] The Court says that materials in "a liquid state" must mean materials which do not settle out. But it is difficult to believe that a nineteenth century Congress, in carving out an exception for liquid sewage, meant to establish an absolute standard of purity which not only bore no relation to the prevailing practice of sewage disposal at the time,[27] but also is impossible to achieve even under present-day technology. It is conceded that despite respondents' best efforts to separate out industrial solids, a few minute particles remain. These comprise a small fraction of 1% of the total solution and the most damaging of them are too small to be seen under a microscope. One need not be an expert to say that the refuse discharged by an ordinary sewer pipe today, and *a fortiori* 60 years ago, undoubtedly contains far more solid matter in suspension than respondents' discharges. And the statute affords no basis for differentiating, as the Court suggests, between industrial and domestic refuse.

## III.

Even if a violation of § 10 or § 13 could be established, injunctive relief would not be authorized. The Court seems to avoid saying that the statute provides for injunc-

---

[26] While a refuse provision was contained in the Dolph bill which became the 1890 Act, the liquid-sewage exception was first added in 1894, 28 Stat. 363, and carried forward into the 1899 Act. There was no discussion in the reports or debates of the meaning of the exception.

[27] In 1900, only 4% of the urban population having sewage facilities provided any treatment at all for domestic and trade wastes. Modern Sewage Disposal (1938), p. 13 (Federation of Sewage Works Assns., Langdon Pearse, editor, Anniversary Book, Lancaster Press, Inc.).

tive relief under the present circumstances, but holds that the propriety of such relief can somehow be "inferred" from the statute. However, where, as in this statute, Congress has provided a detailed and limited scheme of remedies, it seems to me the Court is precluded from drawing on any source outside the Act. One need go no farther than the plain words of § 16, which prescribes the penalties for violation of § 13, to see that an injunction against violation of the latter section is not authorized. As to violations of § 10, section 12 provides only that "the removal of any *structures or parts of structures erected in violation of*" § 9, § 10, or § 11· may be enforced by injunction. (Emphasis added.)

The Government relies heavily on the fact that the comparable provision in § 10 of the 1890 Act authorized injunctive relief against "any unlawful obstruction." A closer examination of that section, however, undermines the Government's conclusion. It authorized criminal penalties in two instances: *First,* for the creation of any unlawful obstruction mentioned in the Act, and *second,* for violation of the preceding four sections. By contrast, the section authorized injunctive relief only in the first instance—the creation of any unlawful obstruction "in this act mentioned." To me this indicates that a deliberate distinction was drawn between those prohibitions relating to obstructions created by construction in the ordinary sense and those relating to other types of interferences with navigation, including the discharge of refuse. In the 1899 Act, the provisions relating to the erection of particular types of obstructions were gathered together in §§ 9, 10, and 11 and subjected to the penalties of § 12. The criminal penalties of § 12 are applicable to *any* violation of the preceding three sections (and any rule promulgated by the Secretary of the Army under § 14), while injunctive relief is limited to "structures or parts of structures," thus reflecting the same distinction

made in the 1890 Act. The provisions relating to violations not involving the erection of any structures, such as discharge of refuse, unauthorized use of government navigational installations, and careless sinking of vessels, were gathered together in §§ 13, 14, and 15 and subjected to the penalties of § 16. The last-mentioned section is conspicuously lacking in any reference to injunctive relief, thus again reflecting the distinction established by the 1890 Act. Since the deposits attributable to respondents' mills are not "structures" within the meaning of § 12, their removal, as I read the Act, cannot be enforced by injunction.

The Court seems to say that § 17, which directs the Department of Justice to conduct the legal proceedings necessary to enforce the Act, itself authorizes injunctive relief. But it would have been futile for Congress to prescribe and carefully limit the relief available for violation of the Act if § 17 were meant to authorize a disregard of those limitations. Section 17, in my view, does no more than allocate within the Government the responsibility for the invocation of those remedies already authorized by Congress.

## IV.

The case of *Sanitary District* v. *United States, supra,* is not, in my opinion, the "decisive" authority which the Court finds it to be, either as to the question whether a violation has taken place or as to whether injunctive relief would be authorized under the present circumstances, given a violation of the Act. The United States in that case had originally sought an injunction against the construction of the Calumet-Sag channel and later against the diversion thereby of water from Lake Michigan in excess of the amount authorized by the Secretary of War. There is no doubt that a substantive violation of the Act was made out under §§ 9 and 10, since the com-

plained-of diversion and consequent alteration in the navigable capacity of the Great Lakes had been brought about by the excavation of a channel and the construction of pumping stations, intercepting sewers, movable dams, and navigational locks.[28] By contrast, respondents in the present case have erected no structures which could give rise to either a violation of the Act or a right to injunctive relief.

To the extent that *Sanitary District* relied on the inherent power of the United States, apart from the statute, it is wide of the mark in this situation. The Court here seems to concede that the *Sanitary* case is no authority for inferring a substantive cause of action arising from the constitutional power of the United States over navigable waters. Indeed, no other conclusion could well be reached in view of the holding in *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1, 8, that "there is no common law of the United States which prohibits obstructions and nuisances in navigable rivers," and of the opinion in *Wisconsin* v. *Illinois,* 278 U. S. 367, 414, which said of the *Sanitary* case that "[t]he decision there reached and the decree entered can not be sustained, except on the theory that the Court decided . . . that Congress had exercised the power to prevent injury to the navigability of Lake Michigan . . . ."

The Court nevertheless seems to find in the *Sanitary* case an authorization to infer that the United States has a right to injunctive relief, despite the statute's failure to provide for it. Whatever the validity of that proposition may have been in the context of *Sanitary,* it can have no

---

[28] Brief for Appellant, pp. 5–14. It is to be noted that the Sanitary District did not challenge the propriety of injunctive relief in the District Court, and indeed invited it to avoid criminal penalties in testing its right to maintain the channel and divert the complained-of amount of water. 266 U. S., at 431–432; Record on Appeal, Vol. VIII, pp. 129, 151–152; Brief for Appellee, pp. 66–67, 284–285.

applicability here. For in the former case, the effect of the complained-of practices was to lower the level of the entire Great Lakes system. The Government there argued that a right to injunctive relief could be inferred because of the repercussions of the State's action beyond its own borders,[29] and the Court expressly relied upon the "sovereign interest" of the United States in all the Great Lakes and upon a treaty with Great Britain touching the use of Canadian boundary waters. In the present case, the waters affected consist of a few miles of the Calumet River lying wholly within the State of Illinois, and no treaty or international obligation is involved.

What has happened here is clear. In order to reach what it considers a just result the Court, in the name of "charitably" construing the Act, has felt justified in reading into the statute things that actually are not there. However appealing the attempt to make this old piece of legislation fit modern-day conditions may be, such a course is not a permissible one for a court of law, whose function it is to take a statute as it finds it. The filling of deficiencies in the statute, so that the burdens of maintaining the integrity of our great navigable rivers and harbors may be fairly allocated between those using them and the Government, is a matter for Congress, not for this Court.

I would affirm.

---

[29] Brief for Appellee, pp. 123–158.