**UNITED STATES of America,**
**Libelant,**

v.

**THE S.S. AMERICAN HUNTER, her engines, tackle, appurtenances, etc.,**
**Respondent.**

United States District Court
S. D. New York.
March 8, 1961.

S. Hazard Gillespie, Jr., U. S. Atty., New York City, for libelant, Benjamin H. Berman, Atty. in Charge, Louis E. Greco, Atty., Captain Morris G. Duchin, U. S. N. Special Atty., Admiralty & Shipping Section, Dept. of Justice, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for claimant. William E. Fuller, New York City, of counsel.

FREDERICK van PELT BRYAN, District Judge.

In this suit in admiralty the Government seeks damages and penalties for the sinking of Ambrose Channel Lighted Whistle Buoy No. 17 on July 29, 1959 by the S. S. American Hunter, respondent vessel.

The amended libel states two claims for relief. The first, based upon general maritime law, sounds in negligence. The second alleges a violation of 33 U.S. C.A. § 408,[1] and seeks to recover the monetary penalties and damages provided for in 33 U.S.C.A. §§ 411[2] and 412[3]. Damages claimed amount to $7,296.87.

Respondent has excepted to the second claim on the ground that the sunken buoy is not a buoy or established mark within 33 U.S.C.A. § 408, as alleged in

---

1. § 408. "Taking possession of, use of, or injury to harbor or river improvements.

"It shall not be lawful for any person or persons to take possession of or make use of for any purpose, or build upon, alter, deface, destroy, move, injure, obstruct by fastening vessels thereto or otherwise, or in any manner whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf, pier, or other work built by the United States, or any piece of plant, floating or otherwise, used in the construction of such work under the control of the United States, in whole or in part, for the preservation and improvement of any of its navigable waters or to prevent floods, or as boundary marks, tide gauges, surveying stations, buoys, or other established marks, nor remove for ballast or other purposes any stone or other material composing such works: *Provided,* That the Secretary of the Army may, on the recommendation of the Chief of Engineers, grant permission for the temporary occupation or use of any of the aforementioned public works when in his judgment such occupation or use will not be injurious to the public interest.

(Mar. 3, 1899, ch. 425, § 14, 30 Stat. 1152.)"

2. § 411. "Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize, or instigate a violation of the provisions of sections 407, 408, and 409 of this title shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, * * *."

3. § 412. " * * * And any boat, vessel, scow, raft, or other craft used or employed in violating any of the provisions of sections 407, 408, and 409 of this title shall be liable for the pecuniary penalties specified in section 411 of this title, and in addition thereto for the amount of the damages done by said boat, vessel, scow, raft, or other craft, which latter sum shall be placed to the credit of the appropriation for the improvement of the harbor or waterway in which the damage occurred, and said boat, vessel, scow, raft, or other craft may be proceeded against summarily by way of libel in any district court of the United States having jurisdiction thereof."

the amended libel, and, therefore, the libel does not state a claim upon which relief can be granted. Respondent contends that only buoys or established marks under the jurisdiction of the United States Army are covered by § 408 and the penalty provisions of §§ 411 and 412. Since the sunken buoy was concededly maintained and operated by the United States Coast Guard, respondent urges that the second claim may not be maintained and that libelant is relegated to its remedies under general maritime law and the penalties provided by 14 U.S.C. § 84, another statute dealing with injuries to navigational aids.[4]

The only question is whether the phrase "buoys, or other established marks" as used in § 408 applies to all such objects erected, owned and maintained by the United States, regardless of what department or agency has jurisdiction over them, or only to buoys and marks under the exclusive jurisdiction of the Army Corps of Engineers.

The answer to this question is not as simple as might appear from a casual reading of the sections involved. This statute must be considered in the light of the existing complementary scheme of legislation for the construction and maintenance of navigational aids by other federal departments and the legislative history of the statute and its predecessors.

Section 408 is derived from the Rivers and Harbors Act of 1899, 30 Stat. 1152. A major portion of the Act is concerned with the appropriation of funds for a variety of public works in the navigable waters of the United States. The approved works were to proceed under the Corps of Engineers. Section 408 of Title 33, which appears in its original and official form as Section 14 of the 1899 Act, was one of a number of general provisions relating to the preservation and protection of public works in navigable waters. The penalty provisions relied upon by the Government in this action, §§ 411 and 412 of Title 33, appear as Section 16 in the 1899 Act.

When the Rivers and Harbors Act of 1899 was enacted, there were already statutes on the books for the establishment and maintenance of buoys and other navigational aids under the Secretary of Treasury.

Title LV, Sections 4653 through 4680 of the Revised Statutes (1874), "Lights And Buoys", established the Lighthouse Board under the supervision of the Secretary of Treasury. The Board was empowered to

"* * * discharge all administrative duties relating to the construction, illumination, inspection, and superintendence of light-houses, light-vessels, beacons, buoys, seamarks, and their appendages, * * procuring illuminating and other apparatus, supplies, and materials fo [sic] all kinds for building, and for rebuilding when necessary, and keeping in good repair the light-houses, light-vessels, beacons, and buoys of the United States * *." Section 4658.

Section 4674 empowered the Secretary, upon recommendation of the Board, to discontinue lights which might become useless or unnecessary. Under Section

---

4. § 84. "Interference with aids to navigation; penalty

"It shall be unlawful for any person, or public body, or instrumentality, excluding the armed forces, to remove, change the location of, obstruct, wilfully damage, make fast to, or interfere with any aid to navigation established, installed, operated, or maintained by the Coast Guard pursuant to section 81 of this title, or with any aid to navigation lawfully maintained under authority

granted by the Coast Guard pursuant to section 83 of this title, or to anchor any vessel in any of the navigable waters of the United States so as to obstruct or interfere with range lights maintained therein. Whoever violates the provisions of this section shall be guilty of a misdemeanor and shall be fined not more than $500 for each offense. Each day during which such violation shall continue shall be considered as a new offense."

4676 the Board was authorized to "place a light-vessel, or other suitable warning of danger, on or over any wreck or temporary obstruction to the entrance of any harbor, or in the channel or fairway of any bay or sound". The Title also established rules for the proper numbering and coloring of buoys.

In 1910, by 36 Stat. 537–539, the greater portion of Title LV was repealed and the Light-House Board was abolished. At the same time the Bureau of Light Houses, headed by the Commissioner of Light Houses, was created in the Department of Commerce and Labor. Section 7 of the 1910 Act set out the new Commissioner's powers as follows:

" * * * control of the construction, maintenance, repair, illumination, inspection, and superintendence of light-house depots, supply stations, light and signal stations, light-houses, light-vessels, light-house tenders, fog signals, submarine signals, beacons, buoys * * * and seamarks and their appendages, and generally of the Light-House Service * * *."

In 1939, pursuant to a governmental reorganization plan, 53 Stat. 1432, the Bureau of Light-Houses was transferred to the Coast Guard, under the general supervisory power of the Department of the Treasury.

In 1876 Congress directed the Secretary of War to report "what legislation, in his opinion, is necessary to protect the breakwaters, piers, and other public works constructed by the United States against trespassers upon or injury thereto * * *." (19 Stat. 139.) The following year the Secretary submitted his recommendations in a report by the Chief of Engineers. (45 Cong.2d Sess., Ex.Doc. 1, Part 2.) One recommendation suggested expansion of existing legislation "to cover not only river, harbor, and navigation works, but also all structures or marks established by the United States, so as to include all boundary-marks, tide gauges, stations, buoys, etc." (p. 829. ) The report then went on to suggest the following proposed legislation to implement this recommendation:

"That it shall not be lawful for any person or persons to take possession of or make use for any exclusive purpose, build upon, alter, deface, injure, obstruct, or in any other manner impair the usefulness of any sea-wall, bulkhead, jetty, wharf, pier, or other work built by the United States for the preservation and improvement of any of its navigable waters, or boundary-marks, tide-gauges, surveying-stations, buoys, or other established marks; nor remove for ballast or other purposes any stone or other material composing such works."

It was not until 1890 (51st Cong. 1st Sess.) that the proposal was finally enacted with some minor modifications. During the intervening thirteen years the proposal had been introduced and passed by the Senate on various occasions. The Senate Committee report accompanying the proposal in the 50th Congress 1st Session set out the report of the Secretary of War in full. (Sen. Rept. 224.) The report of the House Committee on the same bill adopted the Senate report, including the Secretary's report. During the 1st session of the 51st Congress the Secretary filed a further report, H.R.Ex.Doc. 1, Pt. 2, recommending passage of the proposals contained in his 1877 report. The two Committee reports of that session dealing with the subject cited and approved the Secretary's proposals. The proposals were finally enacted by that session with only minor modifications. (26 Stat. 454 . (1890).)

United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, makes it plain that the reports of the Secretary of War recommending the proposals adopted in 1890 evidence the intent of Congress under both the 1890 and the 1899 Acts. The committees responsible for considering this statutory scheme were thoroughly familiar with

these reports and adopted the proposals as recommended.

If the 1890 Act stood alone there would be no doubt, based on the Secretary's report, that Congress intended to include all buoys within the scope of the predecessor of § 408 no matter what department had jurisdiction. The revision of the 1890 Act in 1899 contained an addition to the section dealing with injury to navigational aids which makes this same conclusion somewhat less clear.

The Major change in the 1899 version of § 408 was the addition of the concluding proviso:

> "*Provided,* That the Secretary of the Army may, on the recommendation of the Chief of Engineers, grant permission for the temporary occupation or use of any of the aforementioned public works when in his judgment such occupation or use will not be injurious to the public interest."

If the term "buoys" is given the all-inclusive construction contended for by the Government, then the discretionary power granted to the Secretary of War would cover buoys and marks under the jurisdiction of other cabinet officers. There is at least room for confusion in such a grant.

Yet there is no indication that Congress intended to change the scope of the 1890 Act when adding the concluding proviso. The 1899 Act originated in a proposal by the Secretary of War, 54 Cong.2d Sess., H.R.Doc. No. 293, pursuant to a direction of Congress in the 1896 Rivers and Harbors Act to compile and revise the existing laws on this subject. Nothing in the Secretary's report indicates any purpose to narrow the scope of the then existing enactments and the Supreme Court, in United States

v. Republic Steel Corp., supra, noted that "[t]he 1899 Act was said to contain 'no essential changes in the existing law'." 362 U.S. at page 486, 80 S.Ct. at page 887.

Though such a grant of discretionary power in the proviso clause might lead to administrative confusion Congress could plainly take such action if it so desired. The argument that the proviso clause is an indication that Congress intended to include only public works under the jurisdiction of the Army within the scope of the prohibition of then § 408, does not square with the explicit language of the Secretary's report with which the interested congressional committees were familiar.

A further complication arises when 14 U.S.C. § 84 is considered.[5] This section of the Code was originally enacted in 1908 (35 Stat. 162), as Section 6 of an Act to provide aids to navigation under the Light-House Board.[6] In its original form it prohibited interference with or obstruction of aids to navigation established or maintained under the Light-House Board.[7] The penalty was the same as is presently prescribed by § 84, a fine not to exceed $500 for each offense. When Title 14 was finally codified the references to the Bureau of Light Houses (successor to the Light-House Board) were deleted and "Coast Guard" was substituted in their place.

If Section 408 is construed to cover buoys and marks of any department of the federal government, § 84 seems to have been superfluous. Respondent argues from this that the enactment of the predecessor of § 84, some nine years after § 408 was adopted, is an indication that Congress believed § 408 to cover only navigational aids under the jurisdiction of the Corps of Engineers.

---

5. See footnote 4, supra.

6. As previously noted the functions and duties of the Light-House Board were eventually transferred to the Coast Guard. In 1949 Title 14 U.S.C. was enacted into positive law, 63 Stat. 495, and the original statutes, including 35 Stat. 162, were repealed.

7. Coast Guard regulations, promulgated by the Secretary of Treasury under the authority of 14 U.S.C. § 633, define and use the term "navigational aid" so as to include buoys. See 33 C.F.R. §§ 60.01–5 and 62.25–1 (1960 Supp.).

While the action of a later Congress may on occasion shed light on the purpose of an earlier Congress in enacting prior legislation, it cannot override intent of the earlier Congress as shown by specific evidence. Such evidence is present here. There is nothing to justify a conclusion that the 1908 Act was intended to limit the scope of § 408 as enacted in the 1899 Act, and there certainly is no such limitation by implication. Even if the two Acts do overlap there is nothing which prevents Congress from providing alternative penalty provisions under which the Government may elect to proceed in case of a violation of law.[8]

Thus, after considering the somewhat confusing aspects of this complicated statutory scheme, the only clear evidence of congressional purpose to be ascribed to § 408 is found in the reports of the Secretary of War. Therefore, § 408, under which the second claim of the amended libel is laid, must be construed in accordance with the clear statements of the reports to include all buoys established and maintained by the United States. In particular, the report of the Secretary of War of 1877, which was in essence adopted by Congress when enacting the predecessor of § 408, indicates plainly that this was to be the intended scope of the statute. In the light of this recognized source the courts must follow the intent of Congress as so plainly demonstrated. If statutes overlap or provide different remedies for the same violations of law, the remedy lies with Congress and not the courts. It may be said there is nothing in this rather complicated statutory scheme which makes the construction I have given to Section 408 unfair or unduly burdensome.

It may be noted that the construction which I have placed upon § 408 is in accordance with that given it by the Secretary of the Treasury in regulations dealing with Coast Guard buoys. (33 C.F.R. §§ 70.05–1 through 70.05–15.)

These regulations in substance restate the section in connection with buoys under Coast Guard jurisdiction. While the construction given by these regulations may be entitled to substantial weight (Lykes v. United States, 343 U.S. 118, 127, 72 S.Ct. 585, 96 L.Ed. 791), it is unnecessary to rely on it in the light of what I have found to be the demonstrated congressional intent. Cf. Edwards' Lessee v. Darby, 12 Wheat. 206, 210, 25 U.S. 206, 210, 6 L.Ed. 603, and Koshland v. Helvering, 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268.

I hold that the amended libel states a claim on which the libelant is entitled to relief under 33 U.S.C.A. §§ 408, 411 and 412. The exception to the second claim stated in the amended libel is therefore overruled. Respondent will answer the libel within 20 days from the date of this memorandum.

It is so ordered.

---

8. I do not attempt to pass here on whether such remedies are mutually exclusive.