## THE MANHATTAN.

### THE BESSEMER.

### UNITED STATES v. ATLANTIC REFINING CO.

No. 103 of 1929.

District Court, E. D. Pennsylvania.
Jan. 9, 1935.

See, also (D. C.) 3 F. Supp. 75.

J. Frank Staley, Asst. Atty. Gen., and Charles D. McAvoy, U. S. Atty., of Philadelphia, Pa., for the United States.

Otto Wolff, Jr. (of Lewis, Wolff & Gourlay), of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

The Commissioner in this case was appointed to ascertain the damages arising from a collision which occurred on November 22, 1929, as a result of which the libelant's dredge Manhattan was damaged

and sank in the navigable channel of the Delaware river.

Both parties filed exceptions to the Commissioner's report which have been fully argued twice before the court, the argument taking in all more than two full days. The report itself is carefully considered and may be referred to for a concise but none the less thorough discussion of the points here involved and an excellent analysis of the evidence. I shall therefore deal very briefly with the points raised by the exceptions.

■ The first question is as to the general measure of damages applicable. The Manhattan was actually raised and repaired by its owner, but the Commissioner applied the doctrine of constructive total loss and allowed its value at the time of the collision as damages.

In order to do so the Commissioner made two fact findings: First, that the value of the ship immediately prior to the collision was less than the cost of raising and repairing; and, second, that the owner's decision to raise and repair the ship was not arrived at in a bona fide effort to minimize damages (in which case costs of raising and repairing might have been allowed although in excess of the value of the ship), but arose from considerations which subordinated economy to immediate expediency.

The Commissioner found that the value of the Manhattan was $299,982 and that the allowable cost of raising and repairing was $336,977.22, and took the smaller figure of the two as the principal item of damage. The respondent accepts the theory of constructive total loss and in effect accepts the Commissioner's figure as to the cost of raising and repairing, but contends that the value should be reduced to $236,437.87. The libelant, on the other hand, asks for the cost of raising and repairing as the measure of its damage placing it at $428,094.35, as against a value for the ship of $516,006.51. It will thus be seen that the most important finding for review here is that which relates to the value.

### 1. Value of the Manhattan.

Without amplifying or repeating unnecessarily the Commissioner's discussion upon this point, I hold:

■ (1) That the Commissioner correctly applied the principles laid down by the Supreme Court in The Proteus Case (Standard Oil Company of New Jersey v. Southern Pacific Company, 268 U. S. 146, 45 S. Ct. 465, 69 L. Ed. 890), and that in the absence of evidence of contemporaneous sales or market value he properly based his finding upon the cost of reproduction, less depreciation.

■ (2) That in arriving at the reproduction cost, it was proper to use as a guide what has been referred to as the I. C. C. method of computing reproduction cost—a table or formula published by the American Railroad Presidents Conference Committee for use in determining the reproduction cost of vessels and other floating equipment, and used by the Interstate Commerce Commission in valuing vessels for rate-making purposes. Under this system the known original cost is transmuted into reproduction cost for any given year by applying certain coefficients, percentages, and multiples, giving the changes in costs for that year and representing the resultants of the combined increases or decreases of various items, between the date upon which the vessel was built and the date on which reproduction cost is to be estimated. Without intending to establish a hard and fast rule, I hold that in this case the Commissioner was justified in giving greater weight to the I. C. C. method of valuation than to the libelant's method, which consisted in taking the blueprints and specifications, applying present-day prices as estimated by witnesses from price lists, bids, etc., and adding all the items together.

■ (3) That in adopting a 4 per cent. depreciation rate, applied progressively to ascertain present value, the Commissioner's judgment was properly exercised. The respondent contends that, having started with the I. C. C. method of valuation, the Commissioner had no logical course open but to apply a 5 per cent. rate to it. It is true that the libelant did not offer testimony as to the propriety of applying lower depreciation rates in using the I. C. C. method—quite naturally since it did not accept that method. However, in arriving at present-day value there is no reason why the reproduction cost cannot be ascertained by the use of that method and the court's independent judgment as to the proper depreciation rate for a particular vessel then applied. The Commissioner was not bound to choose between the 5 per cent. contended for by the respondent and the 2½ per

48

cent. contended for by the libelant and used in The Proteus Case. In the first place, it is perfectly clear that the rate of 2½ per cent. adopted in The Proteus Case was the result of exceptional conditions of demand for and scarcity of vessels during an abnormal period; and, in the second place, there was testimony before the Commissioner which clearly indicated a smaller rate for the Manhattan than 5 per cent. (which figure may be, and no doubt is, the rate ordinarily applied in connection with the I. C. C. method). This testimony showed that the Manhattan had been kept in exceptionally good condition by constant supervision and care; that she had been engaged in fresh-water service where deterioration is less rapid than in salt; and that many factors, which make for rapid obsolescence in passenger vessels and less rapid but still formidable obsolescence in cargo ships, do not exist in the case of a seagoing hopper dredge of this type.

■ It is to be remembered that the value found by the Commissioner is an ultimate figure and represents an exercise of judgment upon a question of fact. This judgment must be based upon the evidence, but that includes all matters of fact properly in the record, and the composite need not coincide with the judgment of any particular expert witness. The process by which the final figure is arrived at is of minor importance. A recapitulation of the steps by which it is reached may disclose reasoning which may not appear entirely logical at all points. It is not necessary to set out the process at all, but to do so serves to inform and assist the court upon review. Provided it does not appear that the final result is based upon incompetent testimony, or that matters which should have been considered have been ruled out and disregarded, and provided it coincides with the judgment of the court, based on the evidence, as to the fair value of the property, the Commissioner's figure should stand, and in this case I accept it as correct.

The value thus found being less than the cost of raising and repairing, I am satisfied that the constructive total loss doctrine was properly applied. In raising and repairing the Manhattan the government was obviously solely influenced by the exigencies of the service in maintaining rivers and harbors. The vessel could be gotten back into service in less time than it would take to construct a new one. Beyond this fact the government did not investigate. I

do not think the burden which lies upon one who claims repairs greater than the loss of the vessel because of a mistaken exercise of judgment in endeavoring to serve the ends of economy has been met. See 11 C. J. p. 1208, and The Venus (D. C.) 17 F. 925.

## 2. Interest.

■ The Commissioner allowed interest at the rate of 6 per cent. from the date of the sinking. The respondent challenges the jurisdiction of the court in this respect and also contends that if interest be allowed it should be from the dates of the expenditures for raising and repairing rather than the date of the sinking.

(1) I think that this court has the power to allow interest and that it should be allowed at the usual rate. The interlocutory decree of this court was entered on July 20, 1932 (3 F. Supp. 75). It ordered that the libelant recover "full damages." On March 10, 1933, the Circuit Court of Appeals entered its judgment that the decree of the District Court "be, and the same is hereby affirmed." 63 F.(2d) 995. Neither the decree of the District Court nor the judgment of the Circuit Court of Appeals contained any express provision for allowance of interest. On April 26, 1933, this court entered a decree upon the mandate of the Circuit Court of Appeals allowing full damages with interest and costs.

■ It is true that the original decree which the Circuit Court of Appeals affirmed did not include interest. But I agree with the libelant that the review in the appellate court was a trial de novo and that the appeal vacated the decree of the District Court. It is also true that the rules of the Circuit Court of Appeals for the Third Circuit provide: First, that interest may be allowed if specifically directed by the court; and, second, that, unless otherwise ordered, costs will be allowed, nothing being said about interest. These rules can be read too literally, and, so read, would put it beyond the power of this court to allow interest in its decree entered upon the mandate. But it seems perfectly clear that they were intended to apply to cases in which the question of damages was before the Circuit Court of Appeals and were never meant to cover an appeal from an interlocutory decree which determined nothing but the general question of responsibility. The rules of the Circuit Court (Rule

(4) were adopted at a time when no appeal could be taken from an interlocutory decree, and consequently when every appeal involved damages and interest. Here, however, is an appeal allowed by the act of 1926 from a decree which did not even purport to touch the matter of the amount or the items to be allowed. To apply to such a decree rules adopted at a time when it could not have been brought before the Circuit Court of Appeals at all would simply result in depriving the libelant of interest, when, as a matter of fact, neither the District Court nor the Circuit Court of Appeals has ever considered or passed upon the question—a rather tragic absurdity. I am of the opinion that the rules of the Circuit Court of Appeals referred to do not cover appeals from interlocutory decrees, at least so far as the matter of interest is concerned.

■ (2) As to the rate of interest: Fluctuations in the value of money or in current rates of interest have not, so far, been allowed to affect the rate of interest allowable on verdicts at law, and while the matter is, no doubt, discretionary in admiralty, I see no reason why the ordinary rate should not be adopted in this case. The idea that the government is in a special class by reason of its ability to borrow money at a lower rate of interest or for any other reason has been expressly repudiated by the Circuit Court of Appeals for the Second Circuit in The Comus, 19 F.(2d) 774.

■ (3) The interest allowed, however, should begin to run from the time when the money was spent, not from the date of the sinking. Like the rate, the time from which the allowance is made lies in the discretion of the court. There is no inflexible rule, as a reference to the decisions will readily disclose. Ordinarily, where the vessel is repaired, the interest runs from the date of disbursement. The Sitka (D. C.) 156 F. 427. If the Manhattan had been an actual total loss, there would have been some reason for allowing interest from the date of collision. But the fact is that she was raised and repaired.

■ The doctrine of constructive total loss is a limitation upon the amount of recovery rather than the substitution of a different base. In other words, what the libelant recovers is so much of its cost of raising and repairing as is not in excess of the value of the ship. Its recovery, however, is still recovery of money spent by it and I think the ordinary rule should apply. If the period between the sinking and the final recommissioning of the ship causes specific damage, it may, in a proper case, be recovered as a separate item. There is no showing in this case justifying it.

### 3. Cost of Removing the Wreck as a Derelict.

■ I fully agree with the Commissioner's conclusion that this is not an item which can be added to the government's recoverable damages. In the absence of any statute and before the enactment of the Wreck Statute, the owner of a sunken vessel always had the right to abandon her and thus entirely absolve himself from liability for damages caused by the obstruction of the channel. See Winpenny and Chedester v. Philadelphia, 65 Pa. 135. The theory of the law was that if the sunken vessel is a menace to navigation its disposition is a matter of public concern, and that the owner has suffered sufficient loss in the loss of the craft and no further loss will be imposed upon him by way of damages for subsequent accident, provided always that he has abandoned it. Gulf Coast Transp. Co. v. Ruddock-Orleans Cypress Company (D. C.) 17 F.(2d) 858. It follows that since the removal could not have been required of the owner, its cost in no way increased his loss and consequently could not have been charged by him to the wrongdoer.

The Wreck Statute, U. S. C. tit. 33, §§ 409, 414, 415 (33 USCA §§ 409, 414, 415), did not materially change the law in this respect. Section 415 reaffirms the duty to mark the wreck. It applies to the government as well as private owners. The Snug Harbor (Eastern Transp. Co. v. United States) 283 F. 1015 (D. C.). But we have nothing to do with that section in this case. Section 414 merely reaffirms the law as it stood by which the owner terminates his liability by abandonment (which may consist in doing nothing for thirty days) and the Secretary of War is authorized (but not required) to assume the general governmental duty of clearing the navigable channel. Section 415 provides that he may perform this duty without waiting for abandonment by the owner. The only possible change effected by these statutes is that the government is given either the wreck itself (in case of removal after abandonment)

or a lien against it for the amount expended (in case of immediate removal before abandonment).

Although I think it clear that sections 414 and 415 of the statute were not intended to apply to government vessels sunk in navigable channels, the question is of no moment, because whatever cost falls upon the government in removing any vessel occurs by reason of its general powers and functions and not by reason of its ownership of the wreck. The burden upon the government is exactly the same whether the vessel sunk is government owned or privately owned, or whether it was sunk by wrongful act or by pure accident.

So far as I know the right of recoupment against a tort-feasor who causes a sinking has never been asserted by the government in case the wreck was privately owned, and I can find nothing in the statute which creates such a right either in the case of privately owned vessels or of those which are the property of the government. In fact, the rights in rem which are conferred would seem to negative that intent. At any rate the statute is silent upon the subject.

· 4. The Indeterminate Charge.

The Commissioner disallowed this charge. The question is not material here, but it may be pointed out that in an opinion filed at the same time as this (United States v. Delaware Bay & River Pilots Association and Steam Vessel Philadelphia, No. 289 of 1923, In Admiralty, 10 F. Supp. 43) I held that it was a proper item of damages if supported by satisfactory evidence. In this case the Commissioner found that the evidence was insufficient to support it. Without passing upon that question, it is sufficient to say that if allowed it would only increase the cost of raising and repairing and would not change the application of the doctrine of constructive total loss.

The respondent's fifth exception is sustained.

The libelant's twenty-second exception is sustained.

All other exceptions are dismissed.

· Decree accordingly.