UNITED STATES of America, Appellant,

v.

BETHLEHEM STEEL CORPORATION, a corporation, and Calmar Steamship Corporation, a corporation as Bareboat Charterer of the AMERICAN STEAM SCREW TEXMAR, Official No. 247147, Appellees.

No. 18027.

United States Court of Appeals Ninth Circuit.

June 19, 1963.

Joseph D. Gulfoyle, Asst. Atty. Gen., Brockman Adams, U. S. Atty., Alan S. Rosenthal and Stanley M. Kolber, Attys., Department of Justice, Washington, D. C., for appellant.

Bogle, Bogle & Gates, and M. Bayard Crutcher, Seattle, Wash., for appellee.

Before MADDEN, Judge of the Court of Claims, and BROWNING and DUNIWAY, Circuit Judges.

MADDEN, Judge.

This case presents the question whether a ship owner who by his negligence causes the ship to sink in a channel where it will, until removed, constitute an obstruction to navigation, is liable to the United States for the cost incurred by the United States in removing the ship from the channel.

On December 30, 1960, the ship S. S. Texmar of the appellee Bethlehem Steel Company grounded on a shoal in Grays Harbor, Washington. Attempts to free it were unsuccessful; the ship fractured and became a total loss, obstructing the ship channel. Bethlehem and the other appellee, Calmar Steamship Corporation, which was operating the ship under a bareboat charter from Bethlehem at the time of the ship's grounding, sent certain communications to the United States Army Corps of Engineers and received responses from the Corps of Engineers. On January 13, 1960, the Corps of Engineers notified Bethlehem and Calmar that it was going to proceed to remove the ship from the channel and would charge the expense of doing so to Bethlehem and Calmar. It did so, and the United States says that the cost was in excess of $336,-000, after salvage.

Because of the claim of the United States for reimbursement, Bethlehem and Calmar filed a petition in the United States District Court for the Western District of Washington, seeking exoneration from, or limitation of liability of, the expense arising out of the Texmar incident. The United States filed its answer, denying the right of the petitioners to the relief sought by them, and, in addition to its answer, filed a claim against Bethlehem and Calmar for the $336,000 which, it asserted, it had expended in removing the ship to restore the navigability of the channel. The United States asserted that the wrecking of the ship was the result of the negligence of Bethlehem and Calmar, and it specified nine respects in which it asserted that they had been negligent.

Bethlehem and Calmar moved for dismissal of the claim of the United States on the ground that the claim failed to state a cause of action. The district court, on January 11, 1962, dismissed the claim of the United States, and the United States has appealed to this court against that judgment. It asserts that its claim is valid because certain statutes

provide for the liability which it asserts, and because, even in the absence of those statutes, there is such a liability at common law.

■ Since the district court's judgment was rendered pursuant to a motion to dismiss, we must assume as a fact what the United States asserted in its rejected claim, that is, that the wreck was a result of the negligence of Bethlehem and Calmar. The United States concedes, for the purposes of its argument in this case, that the appellees would not have been liable if the wreck had been the result of misfortune not involving wilfulness or negligence. And the appellees concede, similarly, that if they had purposely sunk their ship and thus obstructed a navigable channel they would have been obligated to remove the wreck or pay for its removal.

As we have said, the Government asserts both a statutory and a common law basis for its claim. Adverting for the moment to the question of the common law basis, we suppose that if one owns a right of way over the land of another, and a third person negligently places an obstruction in that way, he would be legally obligated to the owner of the way to remove the obstruction or pay the cost of its removal. And we suppose that if one, by contract or otherwise, were subject to the duty to keep a right of way open for those entitled to use it, and someone negligently placed an obstruction in the way and refused on request to remove it, the person having the duty to keep the way open could remove the obstruction and recover the cost of the removal from the one who had negligently

caused the obstruction. If those assumptions are correct, and if the law of waterways is like that of land ways, the Government's argument for a common law basis for its claim would seem to have a substantial basis. We return to this problem later in this opinion.

However, there are federal statutes which have a bearing upon our problem and which, both appellees and the Government urge, support their respective positions. We find the statutes difficult to interpret in their application to our problem. The statutes upon which the parties principally rely are contained in the Rivers and Harbors Appropriation Act of March 3, 1899, 33 U.S.C. §§ 401 to 415.

At the beginning of this opinion we said that, after the wreck of the Texmar, certain communications passed between the appellees and the Government. Three days after the Texmar was wrecked, the appellees sent a telegram to the Army Engineers advising that they were abandoning the wreck to the United States. Ten days later, the Army Engineers, by telegram, refused to accept the tendered abandonment and asserted that the ship was an obstruction to navigation within the meaning of §§ 414 and 415 of Title 33, United States Code; that the Engineers were going to remove or destroy the obstruction; and that the expense of doing so would be charged to the appellees. Shortly thereafter, as we have seen, the Engineers did remove the wreck.

There is no doubt about the right or power of the Government, in the circumstances, to remove the wreck and clear the channel. Section 414 [1] is clear as to

---

I. "§ 414. *Removal by Secretary of the Army of sunken water craft generally*

"Whenever the navigation of any river, lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed or endangered by any sunken vessel, boat, water craft, raft, or other similar obstruction, and such obstruction has existed for a longer period than thirty days, or whenever the abandonment of such obstruction can be legally established in a less space of time, the

sunken vessel, boat, water craft, raft, or other obstruction shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of the Army at his discretion, without liability for any damage to the owners of the same: *Provided*, That in his discretion, the Secretary of the Army may cause reasonable notice of such obstruction of not less than thirty days, unless the legal abandonment of the obstruction can be established in a less time, to be given by publication, addressed 'To whom it may con-

this power. The Engineers were in no sense officious intermeddlers when they proceeded to remove the wreck from the channel. And § 414 provides that any recovery from the disposal of the wreck shall belong to the United States. But § 414 says nothing with regard to any personal liability of the owner of the vessel to the United States, whether the sinking was intentional, negligent, or by innocent misfortune.

Section 409 of U.S.C. Title 33 says:

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as 'sack rafts of timber and logs' in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411–416, 418, and 502 of this title."

This section makes it unlawful to do what the appellees did here,[2] i. e., to carelessly sink their vessel in a channel of navigation. They thus became liable, under § 411,[3] to criminal prosecution and a fine of from $500 to $2500. Section 409 further provides that when a craft is sunk, *accidentally or otherwise,* in a navigable channel, the owner must mark it

cern,' in a newspaper published nearest to the locality of the obstruction, requiring the removal thereof: *And provided also,* That the Secretary of the Army may, in his discretion, at or after the time of giving such notice, cause sealed proposals to be solicited by public advertisement, giving reasonable notice of not less than ten days, for the removal of such obstruction as soon as possible after the expiration of the above specified thirty days' notice, in case it has not in the meantime been so removed, these proposals and contracts, at his discretion, to be conditioned that such vessel, boat, water craft, raft, or other obstruction, and all cargo and property contained therein, shall become the property of the contractor, and the contract shall be awarded to the bidder making the proposition most advantageous to the United States: *Provided,* That such bidder shall give satisfactory security to execute the work: *Provided further,* That any money received from the sale of any such wreck, or from any contractor for the removal of wrecks, under this paragraph shall be covered into the Treasury of the United States. * * * "

2. It will be remembered that it has not been determined that the appellees negligently sank their ship. The Government alleged that they did, and the allegation was taken as true for the purposes of appellee's motion in the district court and is so taken for the purposes of this appeal.

3. 33 U.S.C. "§ 411. *Penalty for wrongful deposit of refuse; use of or injury to harbor improvements, and obstruction of navigable waters generally*

"Every person and every corporation that shall violate, or that shall knowingly aid, abet, authorize or instigate a violation of the provisions of sections 407, 408, and 409 of this title shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, in the discretion of the court, one-half of said fine to be paid to the person or persons giving information which shall lead to conviction."

with a buoy or beacon and maintain the marking until the craft is *removed or abandoned.* Failure to maintain the marking is made unlawful, so that for this failure the criminal provisions of § 411 would again be applicable, and this even though the sinking was *accidental,* which, we suppose, means innocent. Then § 409 imposes the duty on the owner to commence the immediate removal of the wreck and prosecute such removal diligently. Then comes significant but by no means clear language, "and failure to do so [i. e., to diligently prosecute removal] shall be considered an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411–416, 418 and 502 of" Title 33.

The appellees' failure to diligently, or at all, prosecute the removal of their wrecked ship was, by § 409, made the legal equivalent of an abandonment of the ship to the United States. We find nothing in the statutes requiring the United States to accept an offer of abandonment of a ship, whether or not it is obstructing a navigable channel. The Engineers might well determine that it would be more economical to dredge a new channel than to remove a wreck from the former channel. This would depend upon whether there would, in the particiuar case, be an obligation on the part of the owner to reimburse the United States for its costs, which is, of course, the question in the instant case, and whether, if there would be such an obligation, the owner would be financially able to perform it. In the instant case, the Engineers notified the appellees that the United States was not accepting the offered abandonment of the Texmar to it. The Engineers said that they were going to clear the channel, pursuant to 33 U.S.C. §§ 414, 415. We quote § 415 in a footnote.[4]

We look to § 415 for the answer to our problem, and we look in vain. What § 415 gives to the United States when the United States acts pursuant to it is a charge or lien against the craft and cargo which the United States has removed from the channel. In the instant case the security was worthless.

What the pertinent sections of the statutes tell us, then, is that it is unlawful to negligently sink a ship in a navigable channel, § 409; that failure by the owner to diligently prosecute removal shall permit the United States to take the wreck and make whatever it can out of its salvage, §§ 409, 414; that what the appellees did was a crime punishable by a fine of from $500 to $2500, § 411; that the fact of obstruction of a channel, regardless of abondonment, authorizes the United States to remove the obstruction and

4. 33 U.S.C. "§ 415. *Summary removal of water craft obstructing navigation*

"Under emergency, in the case of any vessel, boat, water craft, or raft, or other similar obstruction, sinking or grounding, or being unnecessarily delayed in any Government canal or lock, or in any navigable waters mentioned in section 414 of this title, in such manner as to stop, seriously interfere with, or specially endanger navigation, in the opinion of the Secretary of the Army, or any agent of the United States to whom the Secretary may delegate proper authority, the Secretary of the Army or any such agent shall have the right to take immediate possession of such boat, vessel, or other water craft, or raft, so far as to remove or to destroy it and to clear immediately the canal, lock, or navigable waters aforesaid of the obstruction thereby caused, using his best judgment to prevent any unnecessary injury; and no one shall interfere with or prevent such removal or destruction: *Provided,* That the officer or agent charged with the removal or destruction of an obstruction under this section may in his discretion give notice in writing to the owners of any such obstruction requiring them to remove it: *And provided further,* That the expense of removing any such obstruction as aforesaid shall be a charge against such craft and cargo; and if the owners thereof fail or refuse to reimburse the United States for such expense within thirty days after notification, then the officer or agent aforesaid may sell the craft or cargo, or any part thereof that may not have been destroyed in removal, and the proceeds of such sale shall be covered into the Treasury of the United States."

have a charge or lien on the ship for the expense of removal, § 415.

The Government argues that since § 409 makes what the appellees did unlawful, and § 411 prescribes a criminal penalty for having done it, a civil liability for the damages caused by the unlawful conduct must follow, though not prescribed in the statutes. This is frequently the rule applicable to conduct made criminally punishable by statute. The Government asserts, rightly, that the United States, as a proprietor, has the same rights which a citizen has to bring the conventional common law actions for protection of its proprietary rights. It cites Cotton v. United States, 11 How. 229, 13 L.Ed. 675, holding that the United States could, without any statute authorizing such a suit, sue in trespass for the taking of timber from its lands. It cites United States v. San Jacinto Tin Co., 125 U.S. 273, 8 S.Ct. 850, 31 L.Ed. 747, holding that the United States could sue in equity to set aside a patent to lands which patent had been obtained by fraud.

The appellees point out that the United States is not the proprietor of navigable channels such as the one obstructed by the appellees' ship; that the Government's interest in the navigability of such channels arises out of the Constitutional power of Congress to regulate interstate and foreign commerce; that the Government's interest, therefore, is a regulatory and not a proprietary interest.

We think there may be merit in this argument of the appellee. In Willamette Iron Bridge Co. v. Hatch, 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629, the Supreme Court, contrary to a prior opinion of the Attorney General, 6 Op.Atty.Gen. 172, 184, held that there was no federal common law prohibiting obstructions of navigable waters, because Congress had not asserted an interest in such waters by regulating their use, or otherwise. Congress thereafter enacted statutes pertaining to the obstruction of navigable waters, 26 Stat. 426, 454. Against this background, a court should search the statutes carefully to see if they contain answers to legal questions in this area,

and should be hesitant about imposing important legal obligations not expressed or fairly clearly implied in the numerous detailed regulatory statutes enacted by Congress.

The Government would perhaps concede that a degree of hesitancy might be in order, but it urges, in effect, that the necessity for the relief which it seeks is so compelling that any enlightened reading of the statutes will discover authority for that relief. It relies heavily upon the recent case of United States v. Republic Steel Corporation, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903. In that case the steel mill, located beside a navigable channel, was pumping water from the channel for industrial use, and returning it to the channel through sewers. The mill's settling basins did not remove all the solids from the sewage, and many particles, in suspension in the waste water, flocculated into larger units in the channel, sank to the bottom, and in time reduced the depth of the channel by several feet. The United States sought an injunction to stop the deposit of the waste and to restore the depth of the channel. It relied on 33 U.S.C. § 403, which says:

"§ 403. *Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in*

"The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, ha-

ven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

The court in Republic Steel treated the silting of the bottom of the channel as an obstruction within the meaning of § 403. The court then considered whether the remedy of an injunction to forbid the defendant's discharging industrial sewage into the channel without first obtaining a permit from the Department of the Army providing for the removal of solids from the sewage, and a mandatory injunction directing the defendant to restore the channel to its former depth, could be granted. The court recognized that the only section of the Rivers and Harbors Act expressly providing for injunctive relief was § 12, (33 U.S.C. § 406) which spoke of "the removal of any structures * * * erected in violation of the provisions of" several sections of the Act. The court held that the test was "whether the United States had an interest to protect or defend," and that if it had such an interest, an appropriate remedy, injunction in that case, was available to it.

In Republic Steel, if the United States could not have, by injunction, or by a succession of actions for damages measured by the cost to it of frequently dredging the channel, obtained relief against a mill that was persistently creating an obstruction in a navigable channel, its interest in maintaining free navigability would have been seriously impaired. The mill could have, by paying, whenever its silt had built up to the depth of an obstruction, the fine imposed by § 406, in effect operated under a license. The situation clearly called for a legal remedy, and, as the court said, "it [Congress] has provided enough federal law in § 10 [33 U.S.C. § 403] from which appropriate

remedies may be fashioned even though they rest on inferences. Otherwise we impute to Congress a futility inconsistent with the great design of this legislation."

The Government asks us, in effect, to assume that if Congress had, in enacting the Rivers and Harbors Act, put its mind on the question now before us, it would necessarily have desired that the Government be entitled to reimbursement for the expense of clearing a channel obstructed by the negligence of the owner of a ship. In such a situation, courts go far in finding in a statute what a legislature must have intended to put in it. United States v. American Trucking Associations, Inc., 310 U.S. 534, 542, 60 S. Ct. 1059, 84 L.Ed. 1345.

In the instant case it is not clear what Congress would have said if it had spoken expressly to the subject here in question. The appellees urge that before the enactment of the Wreck Statute, i. e., 33 U.S.C. §§ 409, 414 and 415, it was the privilege of the owner of a sunken vessel to abandon it, and if he did abandon it he had no further responsibility with regard to it. In The Manhattan (United States v. Atlantic Refining Co.), 10 F. Supp. 45 (D.C.E.D.Pa.) the court said:

"In the absence of any statute and before the enactment of the Wreck Statute,[5] the owner of a sunken vessel always had the right to abandon her and thus entirely absolve himself from liability for damages caused by the obstruction of the channel. See Winpenny and Chedester v. Philadelphia, 65 Pa. 135. The theory of the law was that if the sunken vessel is a menace to navigation its disposition is a matter of public concern, and that the owner has suffered sufficient loss in the loss of the craft and no further loss will be imposed upon him by way of damages for subsequent accident, provided always that he has abandoned it."

5. Sections 409, 414 and 415 of 33 U.S.C. are known as the Wreck Statute.

Other decisions are in accord with The Manhattan. In Loud v. United States, 286 F. 56 (Cir. 6) Loud's steam barge collided with an abutment in a channel in St. Mary's River. The War Department cleared the channel by straightening the vessel in the channel, expending $18,459 in the process. The court held that the United States was not entitled to recover this expenditure from Loud and that its only claim was a claim *in rem* against the barge and its cargo. No mention is made in the opinion as to whether or not the sinking was negligent. It would seem that it probably was negligent. In United States v. Bridgeport Towing Line, Inc., 15 F.2d 240 (D.C.Conn.), the United States sought an injunction to compel the removal of a canal boat sunk in a navigable channel as a result of the Towing Line's negligence. The court held that the statutory provision, now 33 U.S.C. § 406, authorizing an injunction to compel the removal of "structures erected" in violation of certain sections of the Rivers and Harbors Act of 1899 was not applicable, and denied the injunction. It would seem that if the court had been of the opinion that there was a duty on the part of the Towing Line to remove the wreck, the fact that the relief sought by the United States was a mandatory injunction to remove, rather than reimbursement to the United States, after removal by it, of its expenditures for that purpose, would not have been an obstacle. Cf. United States v. Republic Steel Corporation, supra, 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903. The same may, of course, be said of the denial of an injunction in United States v. Wilson, 235 F.2d 251 (Cir. 2). In that case there was no finding of negligence or other fault on the part of the owner of the wreck.

In The Manhattan, supra, 10 F.Supp. 45, the court held that the United States could not recover, as a part of its damages for the sinking of its barge in a collision with another craft, which collision was due to the fault of the other craft, the cost of raising its barge for the purpose of clearing the channel.

United States v. Zubik, 295 F.2d 53 (Cir. 3) was a case in all essential particulars like our instant case. The court held that the United States could not recover its costs of removing the wrecks from the navigable channel. The court said:

"The sum total of the statutory scheme, excepting its criminal penalty provisions, evidences that the forfeiture right accorded to the Government to remove wrecks obstructing navigable waters is in the nature of an *in rem* right against the removed vessel and not an *in personam* right against the vessel's owner."

In the instant case, the district court, as we have seen, denied the claim of the United States.

The decisions which we have cited constitute an impressive body of authority. There is no decision to the contrary. The Government cites a number of cases in which private proprietors of wharfage or dock space were allowed to recover damages for the obstruction of access to their docks or wharves. Petition of Boat Demand, Inc., 174 F.Supp. 668 (D.C. Mass.); The Irving F. Ross, 8 F.2d 313 (D.C.Mass.); In re Eastern Transportation Co., 102 F.Supp. 913 (D.C.Md.). It cites English decisions under statutes which expressly provide that the owner of a wreck shall bear the expense of removing it from a channel. These decisions are of no assistance in our task of interpreting the Rivers and Harbors Act, or in determining whether, apart from the Act, there is a common law obligation owing to the United States in a case such as the instant one. In Willamette Iron Bridge Co. v. Hatch, supra, 125 U.S. 1, 8 S.Ct. 811, 31 L.Ed. 629, the Supreme Court held that there was no common law of the United States prohibiting obstructions and nuisances in navigable channels. That decision never having been overruled, it is not surprising that no inferior federal court has discussed the question of obstructions of channels and expenditures made by the United States in removing those obstructions on the assumption that there might be an ap-

plicable common law doctrine. Indeed, in the case of United States v. Zubik, supra, 295 F.2d 53 (Cir. 3), the United States did not claim that it had a common law right to reimbursement. United States v. Republic Steel Corporation, supra, 362 U.S. 482, 80 S.Ct. 884, 4 L. Ed.2d 903, on which the Government relies in our case, was urged upon the court in Zubik, but not as having overruled Willamette, or held that the United States had common law rights in the navigability of channels. What was urged in Zubik was that enough could be found in the statutes to justify a judgment against Zubik, since the Supreme Court had found enough in the statutes to justify a judgment against Republic Steel. We conclude, then, that there has been, and is, no common law basis for a recovery by the Government, and that a judgment in its favor would have to find its basis in the Acts of Congress.

Looking to the Rivers and Harbors Act for the answer to our problem, as we think we must, we find that Congress, though dealing in detail with the many problems arising out of wrecks and obstructions to navigation, has not, though it would have been natural and logical for it to have done so if it is so desired, created the right which the Government here asserts.

We conclude, then, that Congress, in the light of the historical law of shipping, which seems to have included a right of an owner to abandon a wreck with impunity, probably did not intend to create, in the Rivers and Harbors Act, the obligation *in personam* which the Government here asserts. If we are correct in this estimate, this court should not read such an obligation into the statutes.

It would not be impertinent to inquire what should be done in the case of an owner who has intentionally scuttled his ship, and thus obstructed a channel. The statutes are as silent about this situation as they are about innocently or negligently created obstructions. In United States v. Hall, 63 F. 472 (Cir. 1), a mandatory injunction was granted compelling the owner, in such a case, to remove the wreck. Obviously the court in such a case would be powerfully impelled toward requiring the owner to remedy his inexcusable wrong. It was the kind of extraordinary case which does not have great value as a precedent. At any rate it has not influenced the courts in the several cases which we have cited, involving, as our case does, negligent sinkings of ships.

■ The Government cites a regulation promulgated, in 1946, on behalf of the Army Corps of Engineers. It is in 11 F.R. 177 A–828. It says:

"By the maritime law the owner of a vessel which is sunk without fault on his part may abandon the wreck in which case he cannot be held responsible for removing it even though it obstructs navigation. That law has not been changed by sections 15, 19, and 20 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1152, 1154; 33 U.S.C. 409, 414, 415), which fully recognizes the owner's right of abandonment. However, a person who willfully or negligently permits a vessel to sink in navigable waters of the United States may not relieve himself from all liability by merely abandoning the wreck. He may be found guilty of a misdemeanor and punished by fine, imprisonment, or both, and in addition may have his license revoked or suspended. He may also be compelled to remove the wreck as a public nuisance or to pay for its removal." 33 C.F.R. 209.410 (1949 ed.)

The last sentence of the regulation would neatly solve our problem. But what it said was contrary to judicial decisions at the time the regulation was issued, and was, if we are correct in our estimate of what the statutes mean, an unauthorized effort to administratively improve the statute.

We think the judgment of the district court was right, and we affirm it.

DUNIWAY, Circuit Judge (concurring).

I concur in the foregoing opinion, but I think that the case for affirmance is a little stronger than Judge MADDEN makes it appear.

I agree that such precedents as there are sustain the conclusion that at common law the liability here asserted did not exist. It follows that if there is any liability it must be based upon the statutes. My reading of those statutes leads me to believe that Congress, in enacting them, did put its mind on the question now before us and intended that the liability should be limited to whatever the United States can get for the vessel. It is true that section 409 states "it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411–416, 418, and 502 of this title." This clause follows the imposition of an obligation to mark the sunken vessel "until [it] * * * is removed or abandoned." Thus, while the statute imposes the duty on the owner to remove, it also deals with what happens when he fails to remove, and specifies only that that failure is an abandonment of the craft and subjects it to removal by the United States.

If we then turn to the statutes dealing with removal by the United States, we find that there are two, sections 414 and 415. Section 414 deals with an obstruction by a sunken vessel, when the obstruction has existed for a longer period than thirty days, or when the abandonment of the vessel can be established in a lesser space of time. It provides that the vessel can be broken up, removed, sold or otherwise disposed of by the Secretary of the Army "without liability for any damage to the owners of the same." This sentence then continues with four consecutive provisos. The first proviso authorizes a published notice "requiring the removal" of the vessel. The second

proviso authorizes the Secretary to advertise for bids for the removal, this removal to be done "in case it has not in the meantime been so removed," presumably by the owner; the contract can be conditioned to provide that the vessel and its cargo shall become the property of the contractor. The third proviso requires the contractor to give security. The fourth proviso states that any money received from the sale of any such wreck or under any contract for the removal of the wreck shall be covered into the Treasury of the United States. Thus, in section 414 Congress recognized the right of the owner to abandon the vessel, considered the possible liability of the government to the owner, and provided against such a liability, and also considered the possible recovery by the government of the cost, as to which it provided for such recovery either through payment by the contractor or through sale of the vessel. *It did not provide for civil liability on the part of the owner or any one else if the moneys derived from the contractor or from the sale of the vessel were insufficient to pay the government's costs.*

The other section is section 415, which deals with emergencies. This section, after providing for the taking of immediate possession of the vessel and removing it, also contains two provisos which are a part of the same sentence. The first proviso again authorizes the giving of notice to the owner requiring him to remove it. The second proviso deals with the expense of removing, and says that it "shall be a charge against such craft and cargo; and if the owners thereof fail or refuse to reimburse the United States for such expenses within thirty days after notification, then the officer or agent aforesaid may sell the craft or cargo, or any part thereof that may not have been destroyed in removal, and the proceeds of such sale shall be covered into the Treasury of the United States." *It does not provide for liability on the part of the owner or anyone else if the proceeds of the sale are insufficient to pay the government's costs.* Thus, again, Congress

provided for giving the owner an opportunity to remove, and specifically dealt with the expense of removal. It even expressly dealt with failure or refusal by the owner to reimburse the United States for such expense. The only remedy it provided was a sale of the craft or cargo, the proceeds to be covered into the Treasury. Surely the alternative of a remedy by suit against the owner for the amount of the expense could not have escaped the attention of the draftsmen, but they did not provide for it.

My views are reinforced by another statute. Section 412 makes a vessel used or employed in violating section 409 liable both for the pecuniary penalties specified in section 411, and in addition for the amount of damages done by it. The mode of recovery is "summarily by way of libel" against the vessel. *Action in personam against the owner for damages is not provided for.*

I think that these statutes demonstrate that Congress did consider the question now before us, that it was aware of the principle stated in The Manhattan, E.D. Pa., 1935, 10 F.Supp. 45, and quoted in Judge Madden's opinion. That principle is that the owner has a right to abandon and thus absolve himself from liability, and its correlative is that the removal of a sunken vessel which is a menace to navigation is a public responsibility, the owner having suffered sufficient loss by the loss of a ship, once he abandons it. I therefore think that United States v. Republic Steel Corp., 1960, 362 U.S. 482,

80 S.Ct. 884, 4 L.Ed.2d 903, which did not involve a vessel, does not require a different result. Here the amount involved is large, and the owner is presumably fully able to pay it. But there are still many shipowners in this country, some of them very small businessmen indeed, such as fishermen, who own but one ship, who have all of their capital tied up in that ship, and to whom the loss of such a ship is an almost irreparable disaster. Imposition upon them of the cost of removing such a ship when it is sunk could make the disaster truly irreparable. I do not think that the Courts should invent such a result when the Congress has not provided for it. The matter should be left to the Congress, so that the conflicting interests involved can be heard and the relative merits of their varying positions can be evaluated, first by appropriate committees and then by the Congress as a whole. (See United States v. Standard Oil Co., 1947, 332 U.S. 301, 314–317, 67 S.Ct. 1604, 91 L.Ed. 2067).

BROWNING, Circuit Judge (dissenting).

The relevant statutes are, indeed, "difficult to interpret in their application to our problem," but a construction which affords the United States the remedy which it seeks is strongly suggested by United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960).

Appellees' alleged conduct in negligently sinking a ship in a navigable channel concededly violated 33 U.S.C. § 409.[1]

---

1. It may have violated 33 U.S.C. § 403 as well. In common usage the term "obstruction" would include a sunken vessel in navigable water. It has this meaning in 33 U.S.C. § 414 and § 415. The term as used in § 10 of the Act of Sept. 19, 1890, was said to include "anything, wherever done or however done * * * which tends to destroy the navigable capacity of one of the navigable waters of the United States." United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 708, 19 S.Ct. 770, 777, 43 L.Ed. 1136 (1899), and this broad definition was applied to the term in § 403 of the present Act in United

States v. Republic Steel Corp., 362 U.S. 482, 487–488, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). In United States v. Wilson, 235 F.2d 251 (2d Cir. 1956), it was assumed that the term, as used in § 403, extended to vessels. The same assumption was made by the court in United States v. Bridgeport Towing Line, Inc., 15 F.2d 240 (D.Conn.1926), although the court also held that § 403 was not violated by negligent or accidental acts as distinguished from "consciously directed action." See also United States v. Hall, 63 F. 472, 474–475 (1st Cir. 1894), holding a vessel to be an "obstruction" within the provisions of § 10 of the Act of

Section 409, like Section 403, reflects the interest of the United States in the unobstructed navigability of its waters. Republic Steel holds that to protect this interest an injunctive remedy must be implied against those who create unauthorized obstructions in violation of Section 403; therefore a like remedy is to be implied against those who voluntarily or carelessly sink vessels in navigable channels in violation of Section 409. Since the United States may by mandatory injunction impose the burden of removal upon one who sinks a ship in violation of Section 409, the government should not be denied restitution if it is compelled to assume the costs of removal by the refusal of the wrongdoer to discharge his duty. See Restatement, Restitution § 115 (1937).[2]

Neither of the reasons advanced in support of the contrary result seems sufficiently strong to overcome the compelling analogy of Republic Steel.

1. It is argued that an injunctive remedy was implied in Republic Steel because the peculiar factual circumstances of that case made imposition of the fine provided by 33 U.S.C.A. § 406 an ineffectual remedy. But the statute also provided for imprisonment of the persons involved for up to one year, which would seem to be an effective deterrent. Moreover, if the deterrent effect of the fine alone were determinative, the government points out that disposing of an obsolete vessel is often a burdensome and expensive undertaking, and that liability for a fine "not exceeding $2,500" (33 U. S.C. § 411) in return for the privilege of "voluntarily or carelessly sinking" a

worthless vessel in some spot convenient to the owner might not be a deterrent, but a tempting bargain.

2. The second argument against implying an *in personam* remedy for violation of Section 409 on the basis of Republic Steel is that the pertinent statutory language, read in the light of an asserted right of the owner of a sunken vessel to abandon it, reveals a congressional purpose to confine the government to an *in rem* remedy against the sunken ship.

The mandate of the statute ("It shall not be lawful * * * to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels * * *.") is directed against personal conduct,[3] and does not depend at all upon ownership of the vessel sunk.

If, as the analogy of Republic Steel suggests, a civil remedy is to be implied to protect the interests of the United States reflected in the prohibition in Section 409, the remedy should be co-extensive with the statutory prohibition; it should be available against the wrongdoer whether or not he is also the owner of the vessel. An innocent shipowner should be free of removal costs because his innocence places him beyond the reach of the prohibition in Section 409; but one who voluntarily or carelessly sinks a vessel should not be permitted to avoid liability for the costs of his wrongdoing simply because he happens also to own the vessel, and chooses, in his own interest, to abandon it.

The pertinent court decisions are few, and divided.[4] However, the suggested

---

Sept. 19, 1890. But see In re Eastern Transp. Co., 102 F.Supp. 913, 915–916 (D.Md.1952), aff'd sub nom. Ottenheimer v. Whitaker, 198 F.2d 289 (4th Cir. 1952).

2. Compare United States v. Standard Oil Co., 332 U.S. 301, 67 S.Ct. 1604, 91 L. Ed. 2067 (1947), in which the Supreme Court rejected the suggestion that it should create, not merely a remedy to protect a statutorily defined interest, but a new basis for liability not founded upon statute.

3. One who willfully commits the acts prohibited by § 409 may be fined and imprisoned, and, if he is a licensed master pilot, or engineer, is subject to the additional penalty of loss or suspension of his license. 33 U.S.C. § 412.

4. The imposition of liability under § 409 where the sinking is deliberate or negligent is supported by the rationale of Chief Judge Coleman's decision in In re Eastern Transp. Co., 102 F.Supp. 913, 916–917 (D.Md.1952), although the sinking in that case was not only voluntary

reading of the statute is supported by the administrative interpretation adopted by the Army Corps of Engineer,[5] which, "while not conclusive of course, is entitled to 'great weight.'" United States v. Republic Steel Corp., 362 U.S. 482, 490 n.5, 80 S.Ct. 884, 889 (1960).[6] It is probably supported, too, by the concession of appellees, and of this Court, that the United States may obtain a personal judgment against the wrongdoers for removal costs if the sinking is deliberate. Since appellees and the Court reject any common-law basis for recovery, this conceded liability must rest on statute. If liability is based on Section 409[7] it must exist whether the sinking is caused deliberately "or carelessly."

The provisions of Section 409 and its related sections relied upon by appellees are not inconsistent with this construction.

The concluding provisions in the last sentence of Section 409, which impose a duty upon the owner of a sunken vessel to mark the wreck and proceed diligently to remove it, are wholly distinct in purpose and application from the prohibition of negligent or willful sinkings. The obligations which these provisions impose have nothing to do with fault; they are solely a consequence of ownership, and the statute appropriately states that they may be terminated by abandonment of ownership. There is no reason to imply a similar limitation upon the remedy available against a wrongdoer who violates the prohibition against deliberately or negligently sinking a vessel (which he may or may not own). .

Similarly, Sections 414 and 415, authorizing the Secretary of the Army to remove and dispose of wrecks, are independent of the prohibition of negligent or willful sinkings. The purpose of these provisions, like that of the provisions in the last sentence of Section 409, is to regulate the relationship between the Secretary and the owner of the wreck; they apply without regard to the cause of sinking. There is nothing in their language[8] or purpose[9] to suggest

but also only proposed. The recent holding of the Court of Appeals of the Third Circuit in United States v. Zubik, 295 F.2d 53 (3d Cir. 1961), and of the District Court in The Manhattan, 10 F. Supp. 45, 49–50 (E.D.Pa.1935), are to the contrary. The latter case held that removal costs could not be recovered from a third party who negligently caused a vessel to be sunk in a navigable channel.

5. 33 C.F.R. 209.410 (1962), first published at 11 Fed.Reg. 177 A–828 (1946), reads:
"*Abandonment of wrecks.*
"By the maritime law the owner of a vessel which is sunk without fault on his part may abandon the wreck in which case he cannot be held responsible for removing it even though it obstructs navigation. That law has not been changed by sections 15, 19, and 20 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1152, 1154; 33 U.S.C. 409, 414, 415), which fully recognize the owner's right of abandonment. However, a person who willfully or negligently permits a vessel to sink in navigable waters of the United States may not relieve himself from all liability by merely abandoning the wreck. He may be found guilty of a misdemeanor and punished by fine, imprisonment, or both, and in addition may have his license revoked or suspended. He may also be compelled to remove the wreck as a public nuisance or to pay for its removal."

6. See F.H.A. v. Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933).

7. The only other possible statutory basis for liability would appear to be § 403. See note 1, supra. See also United States v. Hall, 63 F. 472 (1st Cir. 1894), which was decided, however, before the express prohibition of deliberate or careless sinkings in what is now § 409 came into the law as § 15 of the Act of March 3, 1899, 30 Stat. 1152.

8. It is true that § 414 allows the Secretary to dispose of an abandoned wreck and § 415 gives the Secretary a lien against a vessel for removal costs where the craft is not abandoned, but these specific provisions for economic recovery against the vessel do not argue against imposing liability upon the wrongdoer. As noted, identity of wrongdoer and shipowner would be only coincidental. Even where it occurred, the value of the wreck, as in the present case, might bear no relation to the costs of removal.

that Congress intended Sections 414 and 415 to affect in any way the civil liability of a wrongdoer (one who is perhaps a stranger to the owner), who caused the wreck in violation of Section 409.

Nor can an intention to limit the liability of such a wrongdoer be drawn from a general doctrine allowing a shipowner to abandon his vessel without liability.

First, the privilege applies only to a shipowner, whereas the prohibition of Section 409 applies to all who negligently or willfully sink vessels in navigable channels. Second, it has not been demonstrated that the asserted privilege is applicable at all in the only circumstances in which Section 409 applies, that is, where the wreck results from negligent or willful conduct. The government contends that the privilege of terminating liability by abandonment, like the statutory right of a vessel owner to limit liability,[10] is available only if the owner is without "privity or knowledge." Appellees assert that the privilege is absolute, or at least is not barred by negligent conduct, as distinguished from conduct which is willful. The authorities cited to the issue by both sides are at best meager and inconclusive.[11] Giving appellees the benefit of every doubt, these authorities do not establish with sufficient certainty the existence of a privilege available despite negligence, to jus-

The same comment applies to the provision of § 412 that a vessel "used or employed" in violating § 409 shall be liable for the pecuniary penalties specified in § 411, and for the damage done by the vessel.

9. The purpose of what are now § 414 and § 415 is summarized in H.R.Rep. No. 1826, 55th Cong., 3d Sess. 4 (1899):

"Section 6 and 7 relate to the removal of wrecks from harbors and navigable channels. Under the present law unnecessary delay might occur in removing obstacles from navigable waters, and serious injury to commerce might result from the lack of an efficient and prompt remedy for clearing channels which may be encumbered by wrecks. This Act modifies the existing law. It contains two provisions—section 6, providing for ordinary cases, the scope of which is not greatly different from existing statutes on the subject. The second, or section 7, provides for emergencies, and authorizes the immediate removal or destruction of such wrecks or obstructions as stop or endanger navigation. It is thought that the two sections afford provision for the interests of commerce and at the same time give to the owners of wrecks and abandoned property all possible protection consistent with the essential interest of navigation."

10. 46 U.S.C.A. § 183; Gilmore and Black, The Law of Admiralty 695–97 (1957).

11. Appellees' authorities, considered in chronological order are: Loud v. United States, 286 F. 56 (6th Cir. 1923), which denied recovery of removal expenses against the ship under § 415 because the government failed to assert its lien, but, so far as appeared, involved neither negligence nor abandonment; United States v. Bridgeport Towing Line Inc., 15 F. 2d 240 (D.Conn.1926), which denied an injunction under § 403, on the ground that negligent sinkings, as distinguished from those deliberately caused, were not within that section; The Manhattan, 10 F.Supp. 45 (E.D.Pa.1935), which is relevant to another point (see note 4) but which involved neither a negligent owner of a sunken ship nor abandonment; Zubik v. United States, 190 F.2d 278 (3d Cir. 1951), in which the pertinent comment is admittedly dicta; United States v. Wilson, 235 F.2d 251 (2d Cir. 1956), which involved no negligence, and which was based upon a limitation of remedies drawn from § 406 which was expressly rejected in Republic Steel (a comment also applicable to Bridgeport Towing, supra); and United States v. Zubik, 295 F.2d 53 (3d Cir. 1961), which is factually in point, but relies not at all upon the right to abandon but rather upon the court's reading of the pertinent sections as limiting the government to *in rem* recovery.

Appellant relies upon the holding in Petition of Boat Demand, Inc., 174 F.Supp. 668 (D.Mass.1959), imposing liability for removal expense upon the negligent boat owner despite attempted abandonment, though on the suit not of the United States but of the owner of the wharf at which the vessel rested; and upon language in In re Highland Nav. Corp., 24 F.2d 582 (S.D.N.Y.1927), and Hagan v. City of Richmond, 104 Va. 723, 52 S.E. 385, 3 L.R.A.,N.S., 1120 (1905), indicating that abandonment limits liability only if the sinking was without fault of the owner.

tify the assumption that Congress drew the unequivocal prohibitory language of Section 409 with such an exemption in mind, or intended the remedies for the enforcement of Section 409 to be limited by such an exemption.